# EXHIBIT C

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

RENEWAL ADDENDUM TO FRANCHISE AGREEMENT
ADDRESS ONLY

THIS ADDENDUM is entered into as of even date with the Franchise Agreement dated the 31st day of December 2018, (the "*Agreement*" or "*Franchise Agreement*"), by and between RE/MAX, LLC, d/b/a RE/MAX of Texas, (referred to as "*we,*" "*us,*" or "*RE/MAX, LLC*") and JL United Realty, LLC, (referred to as "*you,*" "**Franchise Owner,**" or "*Franchisee*").

This Addendum is being executed to amend certain terms and conditions of the Franchise Agreement applicable to the renewal of Franchisee's franchise as follows:

1.      Subparagraph (3) of Subsection 2.A. of the Franchise Agreement is hereby amended to read as follows:

(3)    **Term.**

The term of the Franchise will begin on the Agreement Date and continue through July 16, 2022 (the "*Term*"), unless the Franchise is terminated earlier pursuant to the provisions of this Agreement. Termination or expiration of this Agreement will constitute termination or expiration of your Franchise and the Limited License to use the RE/MAX Marks conferred by Section 4 of this Agreement.

2.      The first sentence of Section 3 of the Franchise Agreement is hereby amended to read as follows: You agree that the Office will be "opened" and operating as of the Agreement Date.

3.      Subsection 6.A. of the Franchise Agreement is hereby replaced in its entirety and shall now read as follows:

**6.A.   RENEWAL FRANCHISE FEE.**

You agree to pay us a renewal franchise fee in the amount of $12,500.00 if you pay it in full when you sign this Agreement, or $12,500.00 if you choose to pay it in installments, with the first installment of $4,200.00 due immediately upon signing this Agreement, and the remaining 12 equal installments of $691.67 due monthly thereafter.   You will not be entitled to any rights or privileges under this Agreement until the renewal franchise fee—or if you finance the renewal franchise fee, the first installment—is paid in full.   You agree that we have fully earned the renewal franchise fee and that it becomes non-refundable upon payment to us.

4.      Section 7 of the Franchise Agreement is hereby replaced in its entirety and shall now read as follows:

**7.    MINIMUM AGENT COUNT.**

A.     You agree to have the following minimum number of Sales Associates in your Office by the dates and during the periods set forth below ("***Minimum Agent Count***"):

(1)    Twenty (20) Sales Associates during each of the first 12 months after the Agreement Date;

(2)    Twenty (20) Sales Associates commencing the first day following the expiration of the 12- month period following the Agreement Date and during each month thereafter through the remainder of the Term; and

(3)    Twenty (20) Sales Associates commencing the first day following the expiration of the 36-month period after the Agreement Date and during each month thereafter through the remainder of the Term.

B.     Only Sales Associates who have not been affiliated with the RE/MAX network of real estate offices for at least 12 months prior to their affiliation with you will be counted towards the satisfaction of your Minimum Agent Count requirements set forth above.

C.     Notwithstanding any failure by you to meet your Minimum Agent Count, you will not be

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

excused from the payment of, and you agree to pay, all Monthly Ongoing Fees, advertising fees and contributions and annual dues to us as if you had met your Minimum Agent Count.

5. Subsections 13.B.(1) and (2) of the Franchise Agreement (regarding failure to agree on an office location and failure to open the office) are hereby deleted.

6. Unless specifically amended or modified in one of the above paragraphs, all of the provisions of the Franchise Agreement apply to this renewal, including but not limited to Subsection 2.E., which pertains to future renewal of this franchise relationship. You are reminded that Subsection 2.E.(9) of the Franchise Agreement provides that upon the next renewal of the franchise relationship, you will be required to pay us, at least 90 days prior to the expiration of the Franchise Agreement, a renewal fee equal to $12,500.00 (if paid in a lump sum) or $14,000.00 (if paid in installments). You are also reminded of Subsection 2.E.(8) which states that upon your next renewal:

(8) At least 90 days prior to the expiration of this Agreement, you execute the form of franchise agreement (including the renewal addendum and additional supplemental agreements then being used by us, including if applicable to you, the current form of Team Office Amendment) we are then customarily using in the grant of franchises for RE/MAX offices, which agreement and renewal addendum shall take effect on the day after this Agreement expires, and which will supersede this Agreement and may have materially different and less favorable terms than this Agreement, including without limitation, requirements to upgrade equipment and facilities, use new systems and procedures, pay higher fees, dues and advertising contributions and meet higher minimum agent counts; and

7. The Franchise Agreement supersedes any previous franchise agreements entered into between RE/MAX, LLC and Franchisee. With the exception of any monies that may be due and owing to RE/MAX, LLC at the time of renewal, RE/MAX, LLC and Franchisee agree to release and forever discharge each other from any and all claims, disputes, damages or liabilities, and causes of action of any kind or nature, arising out of any previous franchise agreements entered into between them.

8. This Addendum is intended to be, and is hereby, incorporated in its entirety as a part of the Franchise Agreement and to be read as a material part thereof. It is expressly understood that to the extent, if any, the terms and conditions of this Addendum are different from, or conflict with, those set forth in the Franchise Agreement, this Addendum shall control. This Addendum may not be amended, changed, revised or altered, except by instrument in writing signed by the parties.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the day and year above written.

**RE/MAX, LLC**
**d/b/a RE/MAX of Texas**

By: *Dana Tuggle*        12/22/2018
     Dana Tuggle                         Date

Title: Region Vice President

**Franchisee**
**JL United Realty, LLC**

By: *Cheng Ching Lin*        12/22/2018
                                     Date

Title: President

TEXAS\Exhibit A-1: Renewal Addendum - Address Only
April 2018 (as amended April 16, 2018)

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

# RE/MAX OF TEXAS

# FRANCHISE AGREEMENT

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

## TABLE OF CONTENTS

**SECTION**                                                                                          **PAGE**

1.  INTRODUCTION. ...................................................................................................................1

2.  GRANT AND RENEWAL OF FRANCHISE. ......................................................................2

    A.  GRANT AND TERM OF FRANCHISE. .....................................................................2
    B.  FULL TERM PERFORMANCE. ..................................................................................3
    C.  LOCATION OF OFFICE. ..............................................................................................3
    D.  RESERVATION OF RIGHTS. ......................................................................................4
    E.  RENEWAL OF FRANCHISE. ......................................................................................4
    F.  TEAM OFFICES. ...........................................................................................................5

3.  OPENING AND EQUIPPING OF OFFICE. ........................................................................6

4.  LIMITED LICENSE TO USE RE/MAX MARKS. ...............................................................7
    A.  OWNERSHIP AND GOODWILL AND LIMITED LICENSE. .................................7
    B.  SPECIFIC LIMITATIONS ON LICENSE TO USE RE/MAX MARKS. ...................8
    C.  NOTIFICATION OF INFRINGEMENTS AND CLAIMS. .......................................12
    D.  DISCONTINUANCE OF USE OF RE/MAX MARKS. .............................................12

5.  RELATIONSHIP OF THE PARTIES; INDEMNIFICATION. ..........................................12
    A.  INDEPENDENT CONTRACTOR; NO FIDUCIARY RELATIONSHIP; INDEPENDENTLY OWNED AND OPERATED. ...............................................................12
    B.  CONDUCT OF BUSINESS OF THE OFFICE. .........................................................13
    C.  NO LIABILITY, NO WARRANTIES. ........................................................................13
    D.  INDEMNIFICATION. ..................................................................................................14
    E.  CONFIDENTIAL INFORMATION. ...........................................................................14
    F.  EXCLUSIVE RELATIONSHIP/NON-COMPETITION AGREEMENT ..................14

6.  FEES. .....................................................................................................................................14
    A.  INITIAL FRANCHISE FEE. .......................................................................................14
    B.  MONTHLY ONGOING FEES. ....................................................................................15
    C.  ANNUAL DUES. ..........................................................................................................16
    D.  ADVERTISING FUND. ...............................................................................................17
    E.  TEAM OFFICE FEES. .................................................................................................17
    F.  PAYMENT/LATE CHARGES/INTEREST. ...............................................................17
    G.  APPLICATION OF PAYMENTS. ...............................................................................18
    H.  SUSPENSION OF SERVICES. ...................................................................................18
    I.  SALES ASSOCIATE DEFINED. .................................................................................18
    J.  RE/MAX GOLD PLAN. ...............................................................................................19
    K.  SURVIVING FINANCIAL OBLIGATIONS. .............................................................19
    L.  OUTSIDE LICENSED AGENTS. ...............................................................................19
    M.  OUTSIDE LICENSED AGENT PAYMENTS. ...........................................................20

7.  MINIMUM AGENT COUNT. ...............................................................................................20

8.  BUSINESS IMAGE AND OPERATING STANDARDS. .....................................................20
    A.  APPEARANCE OF OFFICE. ......................................................................................20
    B.  SYSTEM STANDARDS AND OPERATIONS MATERIALS. ..................................21
    C.  COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES. ...................21
    D.  INSURANCE. ...............................................................................................................21
    E.  ORGANIZATION OF FRANCHISE OWNER. .........................................................23
    F.  MANAGEMENT OF THE OFFICE. ...........................................................................24
    G.  TRAINING. ...................................................................................................................24

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

## TABLE OF CONTENTS

**SECTION**                                                                                                                    **PAGE**

H.    PROFESSIONAL MEMBERSHIPS. ...........................................................................24
I.    RE/MAX REFERRAL SYSTEM. ................................................................................24
J.    BROKER/OWNER CONFERENCES, MEETINGS AND RETREATS...........................25
K.    SUPPLIES AND PROMOTIONAL MATERIALS.........................................................25
L.    MODIFICATIONS AND IMPROVEMENTS TO SYSTEM. ...........................................25
M.    REAL ESTATE LISTINGS AVAILABLE VIA REMAX.COM. .......................................25
N.    MAINTAINING INDEPENDENCE, AVOIDING CONFUSION AND ADVERTISING
      COMMISSIONS. .......................................................................................................25
O.    COVENANT CONCERNING ANTI-TERRORISM. ......................................................25
P.    COMPLIANCE WITH THE UNITED STATES FOREIGN CORRUPT PRACTICES ACT.............26

9.    **GUIDANCE AND ASSISTANCE.** ...........................................................................**26**
A.    TRAINING. .............................................................................................................26
B.    OPENING ASSISTANCE. ........................................................................................27
C.    ADVERTISING AND PROMOTION...........................................................................27
D.    CONSULTATION AND EDUCATIONAL COURSES. ...................................................27
E.    SYSTEM RECOGNITION AND PROMOTION.............................................................27
F.    CONVENTIONS AND SEMINARS. ..........................................................................28
G.    PROFESSIONAL PUBLICATIONS AND MATERIALS. ...............................................28

10.   **RECORDS AND REPORTS.** ....................................................................................**28**
A.    ACCOUNTING AND RECORDS. ..............................................................................28
B.    REPORTS. ..............................................................................................................28
C.    OTHER INFORMATION...........................................................................................29

11.   **INSPECTIONS AND AUDITS.**................................................................................**29**
A.    ACCESS TO RECORDS. ..........................................................................................29
B.    AUTHORIZATION FOR RELEASE OF RECORDS; AUTHORIZATION TO CONDUCT
      CREDIT REPORT AND BACKGROUND CHECK. .......................................................30
C.    UNDERSTATEMENT OF AMOUNTS OWED/COST OF INSPECTION OR AUDIT. ...................30

12.   **TRANSFER AND ASSIGNMENT PROVISIONS.**.....................................................**30**
A.    TRANSFER BY RE/MAX, LLC. ...............................................................................30
B.    NO TRANSFER OR ASSIGNMENT BY YOU OR YOUR OWNERS WITHOUT APPROVAL. ....30
C.    CONDITIONS FOR TRANSFER OR ASSIGNMENT OF LESS THAN CONTROLLING
      INTEREST. .............................................................................................................31
D.    CONDITIONS FOR TRANSFER OR ASSIGNMENT OF AGREEMENT OR CONTROLLING
      INTEREST IN FRANCHISE OWNER. .......................................................................31
E.    DEATH, INCOMPETENCY OR PERMANENT DISABILITY.........................................32
F.    TRANSFER TO A BUSINESS ENTITY. .....................................................................33
G.    EFFECT OF APPROVAL OF TRANSFER OR ASSIGNMENT........................................33

13.   **TERMINATION OF THE FRANCHISE.** ..................................................................**33**
A.    TERMINATION BY RE/MAX, LLC WITH CAUSE. ....................................................33
B.    IMMEDIATE TERMINATION. .................................................................................33
C.    10 DAYS NOTICE. ..................................................................................................35
D.    30 DAYS NOTICE. ..................................................................................................35

14.   **RIGHTS AND OBLIGATIONS OF RE/MAX, LLC AND FRANCHISE OWNER UPON
      TERMINATION OR EXPIRATION OF THE FRANCHISE.** .......................................**35**
A.    PAYMENT OF AMOUNTS OWED TO RE/MAX, LLC................................................35
B.    DE-IDENTIFICATION. ............................................................................................36
C.    CONFIDENTIAL INFORMATION.............................................................................37

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

**TABLE OF CONTENTS**

| SECTION | | | PAGE |
|---|---|---|---|

D.     CONTINUING OBLIGATIONS. ...................................................................37
E.     MONETARY OBLIGATIONS NOT RELEASED. ...........................................37
F.     TERMINATION NOT EXCLUSIVE REMEDY. .............................................38
G.     RIGHT TO MEET WITH SALES ASSOCIATES. ..........................................38
H.     DAMAGES. ..................................................................................................38
I.     FUTURE BUSINESS AND RESIDENCE ADDRESSES. ...............................38
J.     POST TERMINATION NON COMPETITION AGREEMENT. ......................38
K.     ERRORS AND OMISSIONS INSURANCE. ................................................38

**15. CONSTRUCTION OF AGREEMENT AND ENFORCEMENT. ............................39**
A.     INVALID PROVISIONS; SUBSTITUTION OF VALID PROVISIONS. ..........39
B.     UNILATERAL WAIVER OF OBLIGATIONS. ..............................................39
C.     CONSENTS. .................................................................................................39
D.     NO GUARANTEES. .....................................................................................39
E.     NO WAIVER. ...............................................................................................39
F.     CUMULATIVE REMEDIES. .........................................................................39
G.     SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF. ................................40
H.     COSTS AND LEGAL FEES. ........................................................................40
I.     WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL. ...........................40
J.     WAIVER OF CLASS ACTION. ....................................................................40
K.     GOVERNING LAW/CONSENT TO JURISDICTION. ................................40
L.     BINDING EFFECT. .....................................................................................40
M.     MODIFICATION OF FRANCHISE AGREEMENT. ......................................41
N.     NO LIABILITY TO OTHERS; NO OTHER BENEFICIARIES. .....................41
O.     PARAGRAPH HEADINGS/CONSTRUCTION. ............................................41
P.     JOINT AND SEVERAL LIABILITY. ............................................................41
Q.     MULTIPLE ORIGINALS. ............................................................................41
R.     TIMING IS IMPORTANT. ...........................................................................41
S.     INDEPENDENT PROVISIONS. ...................................................................41
T.     FRANCHISEE MAY NOT WITHHOLD PAYMENT. ....................................41
U.     RELEASE OF PRIOR CLAIMS. ..................................................................41
V.     ACTIONS BARRED. ...................................................................................42
W.     AUTHORIZATION TO COMMUNICATE ELECTRONICALLY/PROMPT RESPONSE
    REQUIRED. ................................................................................................42
X.     NOTICES AND PAYMENTS. .......................................................................42
Y.     CANCELLATION OF PRIOR UNDERSTANDINGS/ENTIRE AGREEMENT. ..............42
Z.     FORCE MAJEURE. .....................................................................................42

**16. ACKNOWLEDGMENTS. ......................................................................................43**

**17. SUBMISSION OF AGREEMENT. ........................................................................44**

EXHIBIT A – OWNERSHIP AND MANAGEMENT INFORMATION FORMS

EXHIBIT B – ESSENTIAL ICA PROVISIONS

GUARANTY AND ASSUMPTION OF OBLIGATIONS

Texas/ FA
April 2018 (as amended April 16, 2018)

## RE/MAX OF TEXAS
## FRANCHISE AGREEMENT

This Franchise Agreement (this "*Agreement*") is effective as of <u>December 31, 2018</u> (the "*Agreement Date*"). The parties to this Agreement are you, <u>JL United Realty, LLC</u> as Franchise Owner, us, RE/MAX, LLC, d/b/a RE/MAX of Texas, a Delaware limited liability company and, if you are a partnership, corporation, limited liability company or other business entity, your "Owners" (defined below). This Agreement is for a RE/MAX® real estate services office to be located at: <u>9889 Bellaire Boulevard Suite 118, Houston, Texas 77036</u> (the "*Premises*") and operated under the trade name <u>RE/MAX United</u>.

1.   **INTRODUCTION**.

This Agreement has been written in an informal style in order to make it more easily readable and to be sure that you become thoroughly familiar with all of the important rights and obligations this Agreement covers before you sign it. In this Agreement, we refer to RE/MAX, LLC, d/b/a RE/MAX of Texas, as "*we*," "*us*," or "*RE/MAX, LLC*." We refer to each franchisee who signs this Agreement as "*you*," "*Franchise Owner*," or "*Franchisee*." If you are presently a corporation, partnership, limited liability company or other business entity (collectively "*Business Entity*"), or if you, as an individual or individuals, make a subsequent assignment or transfer of this Agreement to a Business Entity under Section 12 of this Agreement, you will notice certain provisions that are applicable to the individual owner(s) of the Business Entity. Depending on the type of Business Entity, these individual owners would be the shareholder(s), partner(s), member(s) or other individuals who have a legal or equitable ownership interest in, or who otherwise have the right to control, the Business Entity. We have relied on the qualifications, business skill, financial capability and personal character of these individual owners in entering into this Agreement with, or in permitting such assignment or transfer to, the Business Entity. These individual owners will be referred to in this Agreement as "*Owners*." If you are a Business Entity that is owned, in whole or in part, by one or more other Business Entities (each a "Parent Entity"), reference to Owners in this Agreement also means the individual or individuals who own or who otherwise have a legal right to control, any Parent Entity.

Through the expenditure of considerable time, effort and money, we have devised and promoted for the benefit of RE/MAX subfranchisors and franchisees (collectively "*RE/MAX Affiliates*") a system (the "*System*" or "*RE/MAX System*") for the establishment of offices ("*RE/MAX office or offices*") offering high quality real estate services under the name "RE/MAX®," the RE/MAX Balloon, branded property listing sign designs and certain other service marks, trademarks, trade dress and other commercial symbols, as RE/MAX, LLC has developed or may develop, acquire, or license for RE/MAX Affiliates' use from time to time (the "*RE/MAX Marks*"). These high quality real estate services are provided under the RE/MAX Marks through a network of RE/MAX franchisees and their affiliated independent contractors (the "*RE/MAX Network*"). The RE/MAX System contains both mandatory elements and recommended practices that exist as a resource for you to control the manner and means of your independently owned and operated franchise business. Specifically, in addition to compliance with all of the terms of this Agreement, you must strictly adhere to the mandatory elements of the System. The mandatory elements of the System are set forth in the most current edition of *RE/MAX Brand Identity: Trademark and Graphic Standards* or its successor (the "*Trademark Manual*"), which is designed to protect the RE/MAX Marks, the goodwill which they reflect, and the reputation of the RE/MAX Network.

The distinguishing characteristics of the System include, but are not limited to:

    (1)     Common use and promotion of the RE/MAX Marks;

    (2)     Distinctive sales and promotional materials;

    (3)     Standardized supplies and other materials used in RE/MAX offices;

    (4)     Centralized advertising, promotional and referral services;

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(5)     Recommended procedures for operation of RE/MAX offices providing efficient, high quality and courteous services to the public;

(6)     Recommended procedures for a standardized uniform system for the operation of a real estate service office in accordance with ethical standards and policies; and

(7)     A high commission concept.

RE/MAX, LLC owns the right to franchise the operation of RE/MAX offices under the RE/MAX Marks and the System in this region.

This Agreement is being presented to you because of the desire you have expressed to obtain the right to own and be franchised to operate a RE/MAX office. In signing this Agreement, you acknowledge your understanding of the importance of our high standards of quality and service and the necessity of operating your RE/MAX office in conformity with our standards and specifications. You represent to us, as an inducement to our entering into this Agreement with you, that there have been no misrepresentations to us, or material omissions, in your application for the rights granted by this Agreement or in the financial information provided by you and your Owners.

2.     **GRANT AND RENEWAL OF FRANCHISE.**

A.     **GRANT AND TERM OF FRANCHISE.**

(1)     Grant.

Subject to the provisions of this Agreement, we grant to you a franchise (the "*Franchise*"), and you undertake the obligation, to establish and own a single RE/MAX real estate office (the "*Office*") using the distinguishing characteristics of the System to be operated only at the location and only under the trade name identified on the first page of this Agreement, both of which must be approved in advance by RE/MAX, LLC. You acknowledge and represent that you have contacted the appropriate state regulatory agencies to confirm that the self-standing portion (--that portion of the trade name that does not include the RE/MAX mark) of the trade name is available. You acknowledge and agree that neither our approval, nor the approval of a state regulatory agency, of the self-standing portion of the trade name constitutes an assurance, representation or warranty of any kind, express or implied, that a prior user of the self-standing portion of the trade name does not exist or that a prior user will not assert rights in that name. If the location of the Premises has not been selected and approved as of the Agreement Date, and the parties cannot agree on a mutually acceptable location within 90 days of the Agreement Date, it will be deemed to be a failure of a material condition precedent, entitling us to terminate this Agreement without refund of the initial franchise fee. You acknowledge and agree that our approval of the location of the Premises does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the location for the Office or as to the profitability of a RE/MAX office operated at that location. You further acknowledge and agree that you have independently investigated the suitability of the location of the Office, and that RE/MAX, LLC will not be responsible if the Office fails to meet your expectations as to revenue or otherwise. You may only operate the Office for the purpose of providing Permitted Real Estate Service Activities as defined below; the Office may not be used to conduct another business or to generate revenue from any other activities, except with our prior written consent, which may be withheld in our sole and absolute discretion.

(2)     Permitted Real Estate Services.

"*Permitted Real Estate Service Activities*", for purposes of this Agreement, means activities directly related to the business of listing, offering, selling, exchanging and managing real property and the providing of marketing or consulting services or other activities with respect to auctioning, leasing or renting of real property or representing sellers, purchasers, lessors or renters of real property. Permitted Real Estate Service Activities expressly excludes all non-real estate related activity as well as the offering or performing of ancillary real estate services or activities, including without limitation, title insurance or

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

searches, mortgage brokerage and mortgage origination, insurance or insurance related services or products, escrow or appraisal services and home inspection services. Subject to the restrictions set forth in Subsection 5.F., you may perform these or other non-real estate related or ancillary services, and you may engage in businesses that offer such services, provided you:

    a.   Obtain RE/MAX, LLC's prior written consent;

    b.   Do not use the distinguishing characteristics of the System or the RE/MAX Marks in any manner in connection with such non-real estate related or ancillary services or businesses or in connection with any other services or businesses that are not Permitted Real Estate Service Activities;

    c.   Properly segregate the operations of any such services or businesses from the operation of the Office as we deem appropriate; and

    d.   Are in full compliance with all applicable federal, state and local laws, ordinances and regulations.

(3)    <u>Term.</u>

The term of the Franchise will begin on the Agreement Date and continue for a period of 5 years, or longer if a greater number is written in the following box and initialed by the parties [   ] (the "**_Term_**"), unless the Franchise is terminated earlier pursuant to the provisions of this Agreement. Termination or expiration of this Agreement will constitute termination or expiration of your Franchise and the Limited License to use the RE/MAX Marks conferred by Section 4 of this Agreement.

B.    **FULL TERM PERFORMANCE.**

You specifically agree to operate the Office in accordance with the provisions of this Agreement, perform the obligations of this Agreement, and continuously exert your best efforts to promote and enhance the business of the Office for the Term.

C.    **LOCATION OF OFFICE.**

The Franchise granted by this Agreement gives you the right to operate a single RE/MAX real estate office only at the Premises, which you may not relocate without our prior written consent. Except as otherwise permitted by this Agreement, you agree that you will not operate or establish, or permit your Sales Associates (as defined in Subsection 6.I. below) to operate or establish, any Team Office, branch office, kiosk, or other extension of the Office from any other location whatsoever without our prior written consent. You further agree not to conduct, or permit anyone affiliated with the Office to conduct, any business or activity at the Premises other than the real estate service business authorized by this Agreement. You expressly acknowledge and agree that absolutely no territorial rights or protections are afforded to you under this Agreement. You further expressly acknowledge and agree that, under the terms of this Agreement, RE/MAX, LLC may operate, or grant a franchise or license to operate, at any location whatsoever, including a location in close proximity to your Office, a RE/MAX office or other real estate brokerage office using any other trademark or service mark, even if such RE/MAX office or other office has an adverse impact on your business. You expressly waive any claims you may have that RE/MAX, LLC violated this Agreement, the implied covenant of good faith and fair dealing, or a law, statute, or regulation as a result of the location of your Office or of other RE/MAX (or other real estate brokerage) offices.

Although you are only granted the right to establish a single RE/MAX real estate office to be operated only at the Premises, neither you nor any other RE/MAX office is limited to listing, selling, or otherwise dealing with property or representing clients or customers within any defined geographic area except as otherwise provided by applicable licensing laws and regulations. However, as a user of the RE/MAX Marks under the Limited License set out in Section 4, you are expected to meet high standards of real estate service and professionalism reflective of the goodwill and respect enjoyed by the RE/MAX name and organization. These expectations may only be met by limiting your real estate services to market areas where you can serve customers and clients directly and personally and where you have the greatest knowledge of local conditions, infrastructures, community history and the housing

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

market. Accordingly, you agree to refer all requests for real estate services in areas in which you are unable to meet such requirements or elect not to provide service, to the RE/MAX office for that area, or if there is no RE/MAX office in that area, then to RE/MAX, LLC's Referral Department as provided in Subsection 8.I. of this Agreement.

D.  **RESERVATION OF RIGHTS.**

Nothing contained in this Agreement shall be deemed, expressly or by implication, to restrict in any way the right of RE/MAX, LLC or any of its affiliates, now or in the future, from engaging in any business activities whatsoever, without limitation as to location or channels of distribution; and from using the RE/MAX Marks and other proprietary rights in their other business activities without limitation; and from selling any products or services under the RE/MAX Marks, or under any other trademarks, service marks or trade dress, through other channels of distribution. You acknowledge that RE/MAX, LLC retains all rights to establish or acquire, or authorize others to establish or acquire, additional real estate brokerage office locations without regard to proximity to the Premises and that such market development is an integral part of the marketing concept underlying RE/MAX, LLC's business. Nothing contained in this Agreement shall be deemed, expressly or by implication, to grant to you any type of exclusive or protected territory or any right to limit, control, or prevent RE/MAX, LLC's right to own, operate, franchise, or license or in any other manner authorize the location and operation of real estate brokerage businesses at any location whatsoever. Moreover, nothing contained in this Agreement shall be deemed, expressly or by implication, to grant or extend to you a right of first refusal, option or any other right to purchase, acquire or open an additional RE/MAX franchise now or in the future.

RE/MAX, LLC shall not be liable to you for any damages or loss of sales or profits (if any), based on actual or anticipated adverse consequences to you which may result from its continuing activities in the development of the System or other exercise of the rights reserved to it under this Agreement.

The term "*affiliate*" as used in this Subsection 2.D. shall mean any entity that directly or indirectly, in whole or in part, is controlled by or under common control with RE/MAX, LLC or any of its officers, managers, directors or shareholders.

E.  **RENEWAL OF FRANCHISE.**

You may, at your option, renew your franchise relationship for an additional period if you meet the following conditions:

(1)  You have complied with all of the terms and conditions of this Agreement throughout the Term;

(2)  You have exercised diligent efforts to develop your Office to its full potential during the Term, in a manner acceptable to us;

(3)  You and your Owners execute a form authorizing RE/MAX, LLC to obtain a consumer report and to conduct a credit and background check;

(4)  You provide us with a copy of your current financial statement, including balance sheet and results of operations, reflecting gross sales and revenues;

(5)  You and your Owners meet our then current subjective and objective standards for new franchisees, including those relating to relevant experience, education and licensing, background and past record of compliance with laws, financial capacity, skills, integrity and other qualities of character;

(6)  You have given us written notice of your election to renew your franchise relationship not less than 6 months nor more than 12 months prior to the end of the Term;

(7)  If required by us, you or your Owner responsible for the Office shall complete, at your expense (including the cost of the course, and all travel, meal, lodging, and entertainment expenses), RE/MAX 501: Maximizing Your Office Potential; and/or such other training as we may deem necessary (or provide us with evidence that you or such Owner has satisfied requirements equivalent to such course or training);

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(8)     At least 90 days prior to the expiration of this Agreement, you execute the form of franchise agreement (including the renewal addendum and additional supplemental agreements then being used by us, including if applicable to you, the current form of Team Office Amendment) we are then customarily using in the grant of franchises for RE/MAX offices, which agreement and renewal addendum shall take effect on the day after this Agreement expires, and which will supersede this Agreement and may have materially different and less favorable terms than this Agreement, including without limitation, requirements to upgrade equipment and facilities, use new systems and procedures, pay higher fees, dues and advertising contributions and meet higher minimum agent counts; and

(9)     At least 90 days prior to the expiration of the Franchise Agreement, you pay us a renewal fee equal to $12,500.00 (if paid in a lump sum) or $14,000.00 (if paid in installments).  If you pay in installments, you will be required to make 12 equal payments (by credit or debit card only) with the first installment due immediately upon signing the renewal addendum, and the remaining installments due monthly thereafter.

You must notify us in writing not less than 6 months nor more than 12 months prior to the end of the Term whether or not you intend to renew your franchise relationship with us.  If you fail to provide us with notice of your intentions regarding renewal within such time period, we will deem your failure to notify us as your decision not to renew.  In such case, you understand and agree that the Franchise shall expire at the end of the Term.

Renewal of your franchise relationship will be conditioned on your and your Owners' continued compliance with all of the terms and conditions of this Agreement up to the date of expiration.

Renewal of your franchise relationship shall be for a 5 year period although under certain circumstances we may, in our sole discretion, allow you to renew for up to a 10 year period.  Factors we will consider in determining whether to grant a longer renewal term include, but are not limited to: (a) whether you have fully complied with all conditions for renewal set forth above; (b) whether you have consistently paid in full and on a timely basis all fees, dues and other amounts owed under the Franchise Agreement throughout the Term; (c) whether you have a proven track record of participation in scheduled RE/MAX events such as annual conventions, Broker/Owner conferences, meetings and retreats, and training and educational seminars; and (d) whether you have demonstrated a spirit of cooperation with us and within the RE/MAX Network that, in our sole discretion, merits consideration for a longer renewal term.

If you continue to operate the Office as a RE/MAX office after the end of the Term without proper renewal, you understand, acknowledge and agree that the Term has expired and that you will be deemed to be operating on a month-to-month holdover basis under the terms and conditions of the franchise agreement then being used by us for the grant of franchises within the state in which the Office is located; provided, however, that (i) in addition to all other fees that you must continue to pay to RE/MAX, LLC pursuant to the then-current franchise agreement we are using, you will be required to pay a monthly holdover fee equal to 1/60th of the renewal fee reflected in Subsection 2.E.(9) above; and (ii) RE/MAX, LLC reserves the unfettered right to terminate at any time, and without cause, your right to continue to operate the Office during this holdover period, upon 10 days prior written notice to you.  During the first 180 days of this month-to-month holdover period, you may terminate the relationship only upon 30 days prior written notice to RE/MAX, LLC.  If you are still operating on a month-to-month holdover basis more than 180 days after the end of the Term, you may terminate the month-to-month holdover relationship only upon 60 days prior written notice to RE/MAX, LLC.  If you close the Office without providing RE/MAX, LLC with the required written notice then, in addition to all fees, dues, charges and other amounts owed by you as of the date you close the Office, you will be required to pay RE/MAX, LLC—as liquidated damages—an amount equal to the total of what you were billed for Monthly Ongoing Fees and Regional Group Advertising Fund fees (as defined in Section 6) for the 2 month period immediately preceding the date that you closed the Office.

F.      **TEAM OFFICES.**

We may grant you the right to establish one or more additional office locations ("**Team Offices**") in order to accommodate Sales Associates (as defined in Subsection 6.I. of this Agreement) who have a team of individuals assisting them and who need additional office space, provided that you shall not then, or at any time thereafter prior to the opening of such Team Office, be in default of any of your obligations arising under this Agreement and subject to the additional conditions set forth below.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

RE/MAX, LLC reserves the unfettered right to grant permission to establish a Team Office. Factors we will consider in determining whether to grant you the right to establish a Team Office include, without limitation, the location of the proposed Team Office, population growth and the overall market share enjoyed by RE/MAX in the area of the proposed Team Office and other market conditions that may affect the desirability of establishing a Team Office.

You must execute the then current form of Team Office Amendment and pay a Team Office Initial Fee (or if you are renewing a Team Office, a Team Office Renewal Fee), as well as a monthly ongoing Team Office Fee, as set forth in Subsection 6.E., for each Team Office you open or renew. Each Team Office shall operate as a part of the Office (i.e., as a branch of the Office operating under and as a part of the same ownership as the Office), shall operate under the same name as the Office and in accordance with Team Office Signage requirements set forth in the Trademark Manual, and, except as otherwise provided in this Agreement, shall comply with—and be subject in every respect to—all of the terms, conditions, provisions and restrictions of this Agreement as are applicable to the Office. You understand and acknowledge that we are not under any obligation to provide Team Offices any of the services and benefits made available to the Office although we may provide some services and benefits to Team Offices as we, in our sole and absolute discretion, deem appropriate. Each Team Office Amendment shall terminate upon transfer, termination or expiration of this Agreement.

Team Offices shall be "address only" locations and therefore shall have no protected area or territorial exclusivity whatsoever. Each Team Office shall be a dedicated RE/MAX facility of at least 600 square feet but no more than 1,500 square feet (RE/MAX, LLC may, in its sole and absolute discretion, allow a Team Office to have more than 1,500 square feet of office space).

3.   **OPENING AND EQUIPPING OF OFFICE.**

You agree to cause the Office to be "opened" and operating within a period of 180 calendar days from the Agreement Date. "*Opened*" means having an office with a minimum of 1,000 square feet (700 square feet if you are starting a new office in a low-density area), staffed by a full-time person, and equipped with furniture, a computer system, a phone system, a fax, a printer and other office equipment necessary to operate a RE/MAX office in conformity with our high standards of quality and service. Unless prohibited by a state or local ordinance, or the landlord of the Premises, you must also have one or more exterior office signs depicting the trade name identified on the first page of this Agreement, and compliant with the most current edition of the Trademark Manual in effect at the time you open the Office.

You acknowledge and agree that you are responsible for assuring that the Office is constructed in compliance with all applicable laws, including without limitation, the Americans with Disabilities Act. You further agree that you will operate the Office continuously during the Term, and that you will not voluntarily abandon, surrender, transfer control of or lose the right to occupy the Premises—or fail to actively operate the Office—for a period in excess of 5 consecutive business days, unless your failure to do so is caused by fire, flood, earthquake or other similar cause beyond your reasonable control, as more fully set forth in Subsection 15.Z.

To facilitate your reporting to us and to meet other communication requirements, you agree to implement all systems, programs and procedures that we establish from time to time. Such systems, programs or procedures may include, but are not limited to, communication systems, accounting programs, data management systems and other systems designed to facilitate the flow of information relating to the System, the RE/MAX Network, or the business contemplated by this Agreement. Throughout the Term, you must maintain a computer system that has capabilities compatible with all of our communications and data reporting requirements. You must have electronic mail capability, high speed Internet access, and a printer. You must participate in any Intranet or Extranet we develop. Therefore, you must have computer hardware that meets certain minimum standards established by us and use certain software as we specify from time to time. You must also upgrade or update such hardware and software throughout the Term as we specify. You are responsible for the cost of implementing such systems, programs or procedures, including the cost of purchasing or leasing computer hardware and software required by us.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

RE/MAX, LLC has developed RE/MAX University ("*RU*") as a way to deliver educational and motivational programming to RE/MAX Affiliates. With the exception of premium programming, such as accredited courses, RE/MAX University programming is available free of charge via the RE/MAX Agent and Office Portal, which you can access via a computer, or some smart phones, mobile devices, and streaming media players.

Specific systems, programs or procedures you are required to implement and use throughout the Term, include, but are not limited to, the following:

*RE/MAX Agent and Office Portal:* You must subscribe, and ensure that each Sales Associate (as defined in Subsection 6.I.) subscribes, to the RE/MAX Agent and Office Portal, a password protected Extranet site which serves as an electronic communication website for the exchange of important RE/MAX information. You, and each Sales Associate affiliated with your office, must also sign and abide by a RE/MAX Agent and Office Member Registration and Portal User Agreement, which sets forth the terms and conditions relating to the use of the RE/MAX Agent and Office Portal. Neither you nor any Sales Associate affiliated with your Office may use the RE/MAX Agent and Office Portal to send unsolicited bulk electronic messages. You agree not to block or blacklist any remax.net message.

*Brokerage back-office management software:* To facilitate your reporting to us, which includes providing detailed, transaction level data for each Sales Associate on a monthly basis, and to enhance the operation of your Office, you must use a brokerage back-office management software system that has capabilities compatible with RE/MAX, LLC's communications and data reporting requirements. You must maintain current versions of the Microsoft Windows operating system or such operating system as may be required by your brokerage back-office management software system provider. The software system that you choose must be able to record, track and monitor transactions and provide office accounting and bookkeeping. To be compatible, your computer must be able to run the most current version of Internet Explorer, Microsoft Edge, Safari, Firefox, or Google Chrome.

You will be required to implement any other specific systems, programs or procedures as we may establish from time to time to enhance our communications with you. You agree that we may require that certain goods, services, supplies, fixtures, equipment, inventory, and computer hardware and software relating to the Office's establishment or operation be purchased directly and/or exclusively from us or from other suppliers as we may designate from time to time. Such requirements will only apply to facilitate communications between you and RE/MAX, LLC and will not control or regulate the manner and means of your day to day operations.

4. **LIMITED LICENSE TO USE RE/MAX MARKS**.

A. **OWNERSHIP AND GOODWILL AND LIMITED LICENSE**.

Subject to all of the terms and conditions set forth herein, you are hereby granted a limited, non-exclusive license ("*Limited License*") to use the RE/MAX Marks, but only for the duration of this Agreement and only in connection with the operation of the Office and the Permitted Real Estate Service Activities specified in this Agreement (the "*Licensed Use*"). Your Limited License does not give you the right to sublicense or to transfer (apart from an approved transfer under Section 12) the RE/MAX Marks or to allow any third party to use your Office trade, fictitious or assumed name for any purpose whatsoever. You agree that if this Agreement is terminated, expires, is transferred without our consent or approval, or is for any reason declared void or of no force or effect, this Limited License shall automatically terminate. You further agree that in the event of such a termination of this Limited License you will immediately cease all use of the RE/MAX Marks and promptly comply with all post-termination requirements of Section 14 of this Agreement.

(1)   "RE/MAX" Required in d/b/a but Prohibited in Entity Name.

You are required to use the term "RE/MAX" as the first word in the trade identification of the Office, and you must obtain any trade, fictitious or assumed name registrations as may be required under applicable law for, and to operate the Office only under, such trade, fictitious or assumed name. You agree not to use the term "RE/MAX" or any of the other RE/MAX Marks (or any variations or renditions similar to any of the RE/MAX Marks) in, or as part of, your formal corporate or legal name.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(2)     Ownership of RE/MAX Marks and Goodwill.

You acknowledge and agree that: i) RE/MAX, LLC is the exclusive owner of the RE/MAX Marks and that such marks are invaluable assets of RE/MAX, LLC; ii) your license to use the RE/MAX Marks is derived solely from this Agreement and is limited to the Licensed Use that is otherwise in compliance with this Agreement; and iii) all use of the RE/MAX Marks, and any goodwill established by such use, including, without limitation, the use of the trade, assumed or fictitious name you adopt for your Office that includes the term "RE/MAX," will inure exclusively to the benefit of RE/MAX, LLC, and that the same will automatically vest in and remain the exclusive property of RE/MAX, LLC. You further acknowledge and agree that under this Agreement you shall not acquire any right, ownership or other interests in or to:  i) the RE/MAX Marks, other than the Limited License granted herein, or ii) the goodwill associated with the RE/MAX Marks.

(3)     High Standards of Service and Professionalism Required.

You acknowledge and agree that the RE/MAX Marks embody and represent the goodwill of the RE/MAX organization, and identify the RE/MAX Network as the source of the highest standards of quality real estate services and agent professionalism. You agree to ensure that the Permitted Real Estate Service Activities provided by you, and by all Sales Associates affiliated with your Office, adhere to such high standards in regards to all Permitted Real Estate Service Activities offered or provided under the RE/MAX Marks and in the name of your Office.  Your Limited License extends only to use of the RE/MAX Marks in accordance with (i) all applicable standards, operating procedures, policies and guidelines that we prescribe—and from time to time amend—during the duration of this Agreement, including, without limitation, those set forth in the most current edition of the Trademark Manual and other publications, if any, dedicated to proper use of the RE/MAX Marks; and (ii) all applicable laws and regulations pertaining to advertising and marketing, including, without limitation, federal and state laws pertaining to telemarketing (including the Telephone Consumer Protection Act), false advertising, unfair competition and unfair practices.  Finally, while you control your marketing choices—subject to the mandatory elements set forth in the Trademark Manual and the limitations set forth in this Section 4—you agree to comply with, and ensure that all of your Sales Associates comply with, the business image and operating standards set forth in Section 8 of this Agreement. You understand and acknowledge that such business image and operating standards have been established to protect the goodwill of the RE/MAX organization, as embodied by the RE/MAX Marks, but do not, and are not intended to, govern the day-to-day operations of your Office.

(4)     Sales Associates Not Licensed to Use RE/MAX Marks.

You acknowledge and agree that no one employed by your Office in any capacity or affiliated with your Office as a Sales Associate has or will be granted by you or RE/MAX, LLC any direct or independent right or license to use the RE/MAX Marks, but rather that their use of the RE/MAX Marks comes under and is subject to this Limited License.  You agree to ensure that you and everyone employed by or affiliated with your Office who uses the RE/MAX Marks under this Limited License does so only in the name of your Office, in furtherance of the Permitted Real Estate Service Activities provided out of your Office, in a manner that is consistent with all applicable limitations, including without limitation, those set forth below.

(5)     Extension of Limited License to Other/Future Marks.

All provisions of this Agreement applicable to the RE/MAX Marks will apply to any additional trademarks, service marks, commercial symbols, designs, art work and logos that RE/MAX, LLC may in the future authorize you to use.

B.     **SPECIFIC LIMITATIONS ON LICENSE TO USE RE/MAX MARKS.**

Your Limited License to use the RE/MAX Marks is subject to various limitations that are designed to protect the RE/MAX Marks, the goodwill they reflect and the reputation of the RE/MAX Network. In addition to those set forth in the Trademark Manual, your use of the RE/MAX Marks must conform to the following requirements and limitations.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(1)     Identity of Office, Address and Contact Information Required with RE/MAX Marks.

You agree that all uses of the RE/MAX Marks in all advertising of your services in any medium whatsoever, including but not limited to print, electronic media, social media, and Internet websites, will be accompanied by your Office name, Office address, phone number and prominently indicate that "Each Office is Independently Owned and Operated," and to ensure that your Sales Associates also accompany their uses of the RE/MAX Marks with such information and meet all other requirements of the Trademark Manual in their advertising and personal promotion efforts. More specifically, you agree not to use, and not to permit your Sales Associates to use, the RE/MAX Marks (a) in any manner that may mislead or deceive consumers in any way, including with respect to your Office location, the scope of the geographic area your Office serves or your relationship to us; or (b) other than for the promotion of the Permitted Real Estate Service Activities provided by your Office.  You agree to refrain from sharing or linking any website, webpage or social media account in connection with which your Office name or the RE/MAX Marks are used with or to any website, webpage or social media account of a competitor of the RE/MAX Network or from promoting the name, image or business of any licensed real estate agent who is not a RE/MAX Affiliate.

(2)     No Service Area Misrepresentations or Competing Services.

While you are not limited in the reach of your advertising to attract consumers to your Office for Permitted Real Estate Service Activities involving the properties in the local market areas your Office serves, you are not permitted to use the RE/MAX Marks in connection with competing or other businesses as described below or to hold yourself out: i) as having the capacity to serve the real estate needs of consumers in distant market areas where neither you nor any of your Sales Associates can personally and directly provide quality, competent services, such as on a state-wide, multi-state, national or international scale; or ii) as a state-wide, multi-state, national or international provider of agent or office locator services or information; or iii) as an operator, developer, owner, promoter or provider of consumer-to-agent or agent-to-agent referral services.   The foregoing limitations shall not be interpreted or asserted to limit or inhibit in any way your ability to refer current or past clients and customers from within the market areas you or your Office serve, or friends and family members, to other RE/MAX affiliates, irrespective of where those other RE/MAX affiliates or their offices may be located and to condition such referrals on the payment of a referral fee.

a.     Local Markets Served Personally and Directly.

Consistent with the foregoing, you agree to ensure that neither you nor your Office nor any of your Sales Associates engage in any advertising, or permit use of your Office name in directories or in any other manner, that offers, or infers the availability by or through your Office of, real estate services in a geographic area or market that is not served personally and directly by you or one of your Sales Associates or where your Office lacks the local market knowledge and familiarity necessary to provide informed, competent, high quality real estate services or that is too distant from your Office for you or any Sales Associate affiliated with your Office to personally and directly serve and satisfy the real estate service needs of buyers, sellers or renters.

b.     No Office/Agent Locator Services or Private Referral Networks.

Your Limited License does not authorize you to use, and you agree not to use, or to permit any Sales Associate to use, the RE/MAX Marks in connection with the offering, providing, performance, sale, endorsement or promotion of any other services, products or businesses or in any other manner we have not expressly authorized in writing.  Consistent with your Limited License, neither you nor any of your Sales Associates are permitted to engage in the offering of or participate in the offering of RE/MAX office/agent locator services or private referral network services or any other prohibited service or activity described in the Trademark Manual as from time to time amended.  In addition, you agree not to engage in any other business or activity that does not conform to the high standards of the RE/MAX organization or that competes with or undermines free services offered to consumers or the RE/MAX Network by RE/MAX, LLC.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(3)     Style of Use, Relative Prominence in d/b/a.

You agree to use and display the RE/MAX Marks in the style and graphic manner illustrated in the Trademark Manual, and to use, along with the RE/MAX Marks, notices of federal trademark and service mark registrations in the manner specified in the Trademark Manual.  You further agree not to use any RE/MAX Mark with any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any other modified form.  In regards to the name of your Office, you agree to use substantially the same size for the term "RE/MAX" as you use for the balance of your trade, assumed or fictitious name, and in particular, that the balance of the name will not be less than 50% nor more than 100% the height of RE/MAX.  You are not permitted in business listings, directories or in referral services where your Office name may be displayed, to exaggerate, enlarge, color or stylize the "RE/MAX" portion of your Office name so as to obscure, dominate or weaken the balance of that name or to otherwise create a presentation that may mislead or deceive consumers to believe they are not dealing with a local real estate service business.

(4)     No Use of RE/MAX Marks by Vendors, Directories, Referral Services, Other Licenses.

You are not permitted to allow any vendor, service provider or other third party to stylize or otherwise engage in any uses of your Office name of the type described above or in any other manner that may suggest they are sponsored or endorsed by, or affiliated with, the RE/MAX Network.  In this regard, you acknowledge and agree that your Limited License to use the RE/MAX Marks does not permit you to allow: (i) any vendor or other third parties to use any of the RE/MAX Marks or your Office name in connection with any vendor's or third party's product or service or in any movie or video or theatrical or musical production or the like, or  (ii) any telephone directory or other directory to show the "RE/MAX" portion of your Office name in an emphasized, exaggerated, enlarged or stylized or any other format that does not give substantially the same prominence to the balance of your trade, fictitious or assumed Office name.  Lastly, you will not authorize or permit real estate licensees who are not registered or licensed as Sales Associates with your Office to appear with or be listed under your name, your Office name, the name of any Sales Associate or of any "Team" known to be associated with your Office or under any of the RE/MAX Marks or to otherwise use or benefit from the use of any of the RE/MAX Marks.

(5)     Ownership and Control Over Use of Office Phone Numbers.

You agree that all telephone numbers you use for the Office shall be used solely in connection with the Permitted Real Estate Service Activities authorized by this Agreement to be provided out of your Office.  You acknowledge that some or all of the telephone numbers will appear under the name RE/MAX, in conjunction with the self-standing name of your Office (the d/b/a of your Office), in directory listings, in yellow pages display advertising and in other forms of advertising.  Neither you nor any of your Sales Associates may publish any telephone advertisement or secure or list any telephone number that could confuse other real estate professionals, the industry or the public about the ownership, operation, location of, or geographic areas or markets served by, your Office or any other RE/MAX office.

(6)     Creation, Ownership and Responsibility for RE/MAX Formative Domain Names.

You are hereby authorized to register and use one or more Internet domain names that include the term "remax" ("*RE/MAX Formative Domain Names*") for so long as the rules for using the RE/MAX Marks in domain names set forth in the Trademark Manual, as updated from time to time, allow such registrations and provided that each such domain name complies strictly with those rules and any other guidelines RE/MAX, LLC issues on RE/MAX Formative Domain Names.  You are not authorized and agree not to register any RE/MAX Formative Domain Name that is not allowed by and is not strictly compliant with those rules.  You agree and acknowledge that neither you nor anyone affiliated with your Office will have any legitimate interest in registering or owning any RE/MAX Formative Domain Name that does not comply strictly with those rules, or retaining ownership of any RE/MAX Formative Domain Names after the transfer, expiration, or termination of this Agreement and that registering or owning any RE/MAX Formative Domain Name that does not comply strictly with those rules, or retaining ownership of any RE/MAX Formative Domain Name after the transfer, expiration, or termination of this Agreement would be an act of bad faith.  You acknowledge and understand that Sales Associates are not authorized to register RE/MAX Formative Domain Names.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

a.    Franchisee Cooperates and Bears Costs to Recover RE/MAX
Formative Domain Names.

Upon request from RE/MAX, LLC, you agree to deactivate, redirect, assign, transfer, terminate and/or disconnect any non-compliant or abandoned RE/MAX Formative Domain Name that was registered by you, the Office, any of your Sales Associates or anyone else currently or formerly employed by or affiliated with your Office, or any entity commissioned to register such domain name by you, the Office, your Sales Associates or anyone else currently or formerly employed by or affiliated with your Office: (i) that does not comply with the form and guidelines specified by RE/MAX, LLC or (ii) that is owned by any Sales Associate affiliated with you at any time and is not assigned to you upon the termination or non-renewal of the independent contractor agreement of such Sales Associate or (iii) that is abandoned without renewal of its registration by you or any Sales Associate.

b.    Other Formats for Internet Addresses.

RE/MAX, LLC may require that various other types of marketing or advertising on the Internet involving the RE/MAX Marks or the name of your Office also utilize a specific template or format and if it does, you agree to follow that template or format.

c.    Further Actions to Transfer Domains or Internet Addresses.

You and your Owners further agree that you will, at your own expense, promptly execute and deliver all necessary documents and take any action reasonably requested by RE/MAX, LLC necessary to effect the assignment and transfer of domain names or Internet addresses required to be deactivated, redirected, assigned, transferred, terminated and/or disconnected pursuant to this Subsection and Subsection 14.B.(5), including compliance with any procedure for the transfer of domain names established by the domain name registrar or entity that issues the address. You agree to direct all Internet service providers, domain name registrars and domain name listing agencies and other third parties to accept this Agreement as conclusive of the rights of RE/MAX, LLC to ownership, control and benefit of all RE/MAX Formative Domain Names and Internet addresses you or your Sales Associates create. You and your Owners further hereby appoint RE/MAX, LLC as your agent and attorney-in-fact to act for and on your behalf to execute, register, and file such documents, complete such processes, and to perform all other lawfully permitted acts as the registrar, or any applicable law, requires to effectuate a transfer of such domain names or Internet addresses with the same legal force and effect as if executed by you or your Owners. You agree to pay directly, or reimburse RE/MAX, LLC for, any and all costs and attorney fees RE/MAX, LLC incurs in the process of obtaining and/or deactivating (in RE/MAX, LLC's sole discretion), any such domain name or Internet Address.

(7)    Electronic Links to RE/MAX, LLC Websites May Be Required.

If we so require, you shall establish your website(s) as part of our website(s), and/or establish electronic links to our website(s).

(8)    Ownership and Use of Hot Air Balloons.

You acknowledge and agree that RE/MAX hot air balloons, which are intended to be used to maximize public awareness and recognition of the RE/MAX name and to promote and enhance public goodwill reflected in the RE/MAX Marks, must always remain under the control and ownership of RE/MAX, LLC or one of its duly appointed designees. You understand that RE/MAX, LLC or one of its designees will exercise reasonable efforts to make a RE/MAX hot air balloon available to you for a reasonable fee should you desire to use one for promotional purposes. You agree that neither you, your Owners nor your Sales Associates will purchase or own, for any purpose, a RE/MAX hot air balloon or any hot air balloon depicting a red-over-white-over-blue trade dress, or that otherwise depicts, or is confusingly similar to, any of the RE/MAX Marks.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(9)   <u>Franchisee Supervision Required to Ensure Compliance</u>.

You agree to be responsible for, and to supervise, your Sales Associates in order to ensure the proper use of the RE/MAX Marks and their full compliance with the provisions of this Section 4 and the Trademark Manual as it may be amended from time to time. You acknowledge and agree that if you make, or anyone employed by or affiliated with your Office makes, any improper or unauthorized use of the RE/MAX Marks, it will constitute an infringement of RE/MAX, LLC's exclusive rights in and to the RE/MAX Marks and a default of Section 4 of this Agreement. A default under the provisions of this Section 4 by you or anyone employed by or affiliated with your Office shall be deemed a material default of an essential condition of this Agreement that, in addition to other recourses available to RE/MAX, LLC, will give rise to the termination provisions of Section 13.

C.   **NOTIFICATION OF INFRINGEMENTS AND CLAIMS.**

You agree to immediately notify us in writing of any third-party infringement of or challenge to any of our copyrights or any of the RE/MAX Marks, or of any claim by any person of any rights in such copyrights, RE/MAX Marks or similar trade names, trademarks or service marks of which you become aware. You agree not to communicate with anyone except us and our respective counsel in connection with any such infringement, challenge or claim and agree that we will have the sole right to determine whether an infringement, challenge or claim exists, and if so, to exclusively control any litigation, any U.S. Patent and Trademark Office proceeding or any other proceeding arising out of any such infringement, challenge or claim. You agree to cooperate with and assist us with the initial and any follow up investigation of the alleged infringement of or challenge to RE/MAX, LLC's copyrights or Marks. You agree to sign any documents, render any assistance, and do any acts that we, in our sole discretion, believe are necessary or advisable in order to protect or maintain our interests in any litigation or proceeding related to such copyrights or the RE/MAX Marks or to otherwise protect, maintain or perfect our interests in such copyrights or the RE/MAX Marks. You acknowledge and understand that RE/MAX, LLC will have no obligation to defend the RE/MAX Marks from valid claims of prior use or of lawful concurrent use by others.

D.   **DISCONTINUANCE OF USE OF RE/MAX MARKS.**

If it becomes advisable at any time in our sole judgment for the Office to modify or discontinue the use of any RE/MAX Mark or for the Office to use one or more additional or substitute trade or service marks, including the RE/MAX Mark used as part of the trade, fictitious or assumed name of the Office or in a domain name, you agree, at your expense, to comply with our directions to modify or otherwise discontinue the use of the RE/MAX Mark, or use one or more additional or substitute trade or service marks, within a reasonable time after our notice to you.

5.   **RELATIONSHIP OF THE PARTIES; INDEMNIFICATION.**

A.   **INDEPENDENT CONTRACTOR; NO FIDUCIARY RELATIONSHIP; INDEPENDENTLY OWNED AND OPERATED.**

Both of us understand and agree that this Agreement does not create a fiduciary relationship between us, that you are an independent contractor, and that nothing in this Agreement is intended to make either party a general or special agent, joint venturer, partner, or employee of the other for any purpose whatsoever. All employees or agents hired or engaged by or working for you shall be your employees or agents only and shall not for any purpose be deemed employees or agents of RE/MAX, LLC nor subject to RE/MAX, LLC's control or right of control. However, we have the right, and you must permit us, to communicate directly with your Sales Associates concerning any matter that we deem necessary or appropriate relating to the System or your Office, without incurring any liability to you. You agree to conspicuously identify yourself in all your dealings with clients, customers, suppliers, public officials, Office personnel, and others as the owner of the Office pursuant to a Franchise Agreement with us. You shall place, and you shall ensure that everyone affiliated with the Office places, a statement on all forms, business cards, stationery, advertising, and other materials that "Each Office is Independently Owned and Operated" or such other statement as we may require from time to time. Such a statement must also be displayed in a prominent place near the main entrance to the Office and in the reception area.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

B.     **CONDUCT OF BUSINESS OF THE OFFICE.**

(1)     You Control the Conduct of Your Business and the Office.

You understand and agree that we shall have no authority to exercise control over the day-to-day conduct of your business and the Office, including but not limited to the time and manner in which you obtain listings and sell properties, the commission rates charged by the Office, the commission splits negotiated between you and your Sales Associates, the details of the work performed by you or your employees and agents, the hiring or termination of your employees and agents, the compensation, working hours or conditions or the day-to-day activities of such persons except to the extent necessary to protect the RE/MAX Marks and the mandatory elements of the System and the goodwill associated with the RE/MAX Marks and the System. All activity within the Office, including those described above, will be determined by you in your own judgment, subject only to the laws and regulations of the state in which the Office is located, the terms of this Agreement, and the standards, procedures, policies and guidelines prescribed by us for the preservation of the goodwill associated with the RE/MAX Marks. You acknowledge and understand that such standards, procedures, policies and guidelines are not fixed, and may, from time to time, be modified or revised by us to reflect existing conditions in the highly competitive real estate services marketplace to the extent they are necessary to protect the RE/MAX Marks and goodwill.

(2)     Model ICA/Essential ICA Provisions.

For your convenience and reference, we have developed a model independent contractor agreement ("*ICA*") for you to consider using as a framework for an independent contractor relationship with your Sales Associates. While you are not required to use the ICA developed by us, it does contain certain essential provisions ("***Essential ICA Provisions***"). The Essential ICA Provisions do not pertain to or govern the day-to-day operation, management or activity of the Office, which is entirely determined by you in your own judgment; rather, the Essential ICA Provisions are designed in large measure to help preserve and protect the valuable RE/MAX Marks and the good will associated with the RE/MAX Marks. RE/MAX, LLC's model ICA also includes other common or important provisions that are generally regarded as significant, if not necessary, in ICAs. You agree that it is your responsibility (i) to determine if any amendments are necessary or appropriate to satisfy state specific laws, rules or regulations, local business practices or customs, and (ii) to assure that the final form of ICA that you use meets your business and tax needs.

Although the form of agreement you use is up to you, you are required to have in place a fully executed and in force written ICA with each of your Sales Associates that includes the Essential ICA Provisions. The current Essential ICA Provisions are set out in Exhibit B attached hereto and you shall cause these Essential ICA Provisions to be incorporated into each and every ICA you enter into or renew with your Sales Associates. As future changes, additions or modifications to the Essential ICA Provisions are promulgated by RE/MAX, LLC, you will have 60 days within which to amend your ICA form to include the new Essential ICA Provisions. You then shall use that amended, compliant ICA form, or some alternative compliant ICA form, for all of your new and renewal ICAs so that at the end of the 12 month period following the amendment of your ICA, all of your Sales Associates will be parties to an ICA containing the most current Essential ICA Provisions.

C.     **NO LIABILITY, NO WARRANTIES.**

We have not authorized or empowered you to use the RE/MAX Marks except as provided by this Agreement and you agree not to employ any of the RE/MAX Marks in signing any contract, check, purchase agreement, negotiable instrument or legal obligation, application for any license or permit, or in a manner that may result in demands for payment or assertions of liability directed to us for any indebtedness or obligation of yours. Except as expressly authorized by this Agreement, neither of us will make any express or implied agreements, warranties, guarantees or representations, or incur any debt, in the name of or on behalf of the other or represent that the relationship between us is other than that of franchisor and franchisee. You acknowledge that you do not have the authority to bind or obligate RE/MAX, LLC in any way by any promise or representation or any other action or inaction.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

D.   **INDEMNIFICATION.**

You shall be solely and exclusively responsible for any fines, taxes, costs, expenses, damages, loss or liability, of any kind or nature, arising out of any suits, actions, proceedings or claims (collectively "*Claims*") relating to your business or the operation of the Office even if such Claims are brought or filed after transfer, termination or expiration of this Agreement. You agree to indemnify, defend and hold us, and each of our affiliated entities, shareholders, partners, directors, officers, managers, employees, lawyers, agents, affiliates and assignees, harmless from and against, and to reimburse us and them for, all such fines, taxes, costs, expenses, damages, loss or liability for which we or they are held liable or which we or they reasonably incur in connection with any Claims, including, without limitation, actual and consequential damages, reasonable attorneys', accountants', and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses. We have the right to defend any Claims and, in connection therewith, to retain legal counsel of our choice. You agree to cooperate with us in the defense of, and not to settle or compromise, without our prior written consent, any Claims to which we are a party or which may affect our interests. Your indemnification obligations described above will continue in full force and effect after, and notwithstanding, the transfer, expiration or termination of this Agreement.

E.   **CONFIDENTIAL INFORMATION.**

You acknowledge that you have been given access to and will be informed regarding confidential matters, trade secrets, recruiting techniques, accounting procedures, quality control procedures and other methods developed by RE/MAX, LLC as part of the System which, for purposes of this Agreement, are owned by RE/MAX, LLC and which are necessary and essential to the operation of the Franchise, without which you could not efficiently, effectively, and profitably operate the same (collectively the "*Confidential Information*"). You further acknowledge that the Confidential Information was unknown to you prior to negotiation for and execution of this Agreement, and that the unique and novel combination of "know how" and methods developed by RE/MAX, LLC and licensed to you by us for the operation of the Office are peculiar to the real estate business conducted by RE/MAX offices. You agree to take all steps necessary, at your own expense, to protect the Confidential Information, and shall not divulge any of the Confidential Information to any other person either during the Term or subsequent to the transfer, termination or expiration of this Agreement without our prior written consent.

F.   **EXCLUSIVE RELATIONSHIP/NON-COMPETITION AGREEMENT.**

You acknowledge and agree that we would be unable to protect the Confidential Information against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among RE/MAX offices and RE/MAX Affiliates and between us and RE/MAX offices and RE/MAX Affiliates if you or your Owners were permitted to engage in other businesses competitive with RE/MAX offices or with us. Accordingly, you agree that without our prior written consent, which we have the unfettered right to withhold, neither you (nor if you are an entity, your Owners), nor your spouse or domestic partner, nor your Sales Associates (including, but not limited to, your manager or designated or managing broker of record), will during the Term, directly or indirectly, as an officer, director, shareholder, member, partner, manager, employee, agent or otherwise, operate, manage, own, have an interest in or become affiliated with in any other way (1) any non-RE/MAX real estate service business; or (2) any other business or enterprise offering products or services that directly or indirectly competes with the products and services offered by RE/MAX offices, RE/MAX, LLC, or any of our affiliates.

You agree that our consent to your entering into or continuing other businesses prohibited by this Subsection 5.F. may be contingent upon amendment of this Agreement and/or immediate or future acquisition from us of a franchise covering such business. You also agree to support the natural expansion by us into related service businesses including, without limitation, mortgage, insurance, property management and relocation.

6.   **FEES.**

A.   **INITIAL FRANCHISE FEE.**

When you sign this Agreement, you agree to pay us an initial franchise fee (the "*Initial Franchise Fee*") equal to $N/A (renewal) (if paid in a lump sum) or $N/A (renewal) (if paid in installments). You will not be entitled to any rights or privileges under this Agreement until the Initial Franchise Fee is paid in full, or if you are financing

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

the Initial Franchise Fee, until you have paid the initial installment due under the financing. You agree that we have fully earned the Initial Franchise Fee and that it becomes non-refundable upon payment to us.

B.   **MONTHLY ONGOING FEES.**

You agree to pay us monthly ongoing fees ("***Monthly Ongoing Fees***") as follows:

(1)   Component One Continuing Franchise Fee.

The first component, the Component One Continuing Franchise Fee ("***Component One Continuing Franchise Fee***"), may be referred to simply as "continuing franchise fee" on billing statements or invoices you receive. Under this component, you agree to pay us, on a monthly basis, $128 per month for each Sales Associate (as defined in Subsection 6.I. below) in your Office during the previous calendar month whether or not you actually collect management fees from your Sales Associates, as recommended below. The Component One Continuing Franchise Fee is due and will be considered late if not received by us by the 10th day of the month after the month the Office opens and by the 10th day of each month throughout the remainder of the Term of this Agreement. We will have the right to increase the amount of the Component One Continuing Franchise Fee once in any calendar year, provided such increase will not exceed 10% of the Component One Continuing Franchise Fee amount in effect at the time of any such increase. It is currently anticipated that this fee will increase by at least $2.50 on July 1, 2018, and by at least $2.50 on the 1st day of July in each subsequent year of the Franchise Agreement.

We recommend that you, in turn, charge each of your Sales Associates a monthly management fee.

(2)   Component Two Continuing Franchise Fee.

The second component of the Monthly Ongoing Fees is the Component Two Continuing Franchise Fee ("***Component Two Continuing Franchise Fee***"), which may be referred to simply as "Broker Fee" on billing statements or invoices you receive.

Except as provided below with respect to "Grandfathered Sales Associates", you agree to pay us, as a Component Two Continuing Franchise Fee, an amount equal to 1% of the first $250,000 of gross commissions (including referral fees) and other revenue earned, derived or otherwise generated from Permitted Real Estate Service Activities (defined in Subsection 2.A.(2) above) handled by each one of your Sales Associates during the previous calendar month whether or not you actually collect a "broker service fee", as recommended below. Once a Sales Associate earns $250,000 in commissions, you will not be required to pay a Component Two Continuing Franchise Fee on behalf of that Grandfathered Sales Associate for the remainder of the calendar year (RE/MAX, LLC reserves the right to adjust or eliminate this benefit at any time). This Component Two Continuing Franchise Fee is due and will be considered late if not received by us by the 10th day of the month after the month the Office opens and by the 10th day of each month throughout the remainder of the Term of this Agreement.

With regard to Sales Associates that you have designated as Grandfathered Sales Associates (see qualifications below), you agree to pay us, as a Component Two Continuing Franchise Fee, an amount equal to 0.6% of the first $250,000 of gross real estate commissions (including referral fees) and other revenue earned, derived or otherwise generated from Permitted Real Estate Service Activities handled by each one of your Grandfathered Sales Associates during the previous calendar month whether or not you actually collect a broker service fee, as recommended below. Once a Grandfathered Sales Associate earns $250,000 in commissions, you will not be required to pay a Component Two Continuing Franchise Fee on behalf of that Grandfathered Sales Associate for the remainder of the calendar year (RE/MAX, LLC reserves the right to adjust or eliminate this benefit at any time).

In addition to the monthly management fee referred to in Subsection 6.B.(1) above, we recommend that you retain a small percentage of the gross commissions (including referral fees), earned, derived or otherwise generated from Permitted Real Estate Service Activities handled by your Sales Associates or Grandfathered Sales Associates ("***Broker Service Fee***"). We currently recommend, but do not require, that your Broker Service Fee be 5%.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

Grandfathered Sales Associates. To qualify as a '*Grandfathered Sales Associate,*' the Sales Associate must have been affiliated with your Office or another RE/MAX office prior to May 1, 2005, and must have maintained his or her affiliation with your Office or another RE/MAX office continuously since that time, with the exception of temporary departures from the RE/MAX organization (no greater than 12 consecutive months).

Immediately upon transfer to your Office of any Sales Associate who is eligible to be a Grandfathered Sales Associate, you must elect whether or not to designate that Sales Associate as such. Such designation must be in writing. If you do not immediately make such designation, you will be required to pay us a Component Two Continuing Franchise Fee with respect to that Sales Associate.

If a Grandfathered Sales Associate falls more than 6 months behind in the payment of Annual Dues (as defined in Subsection 6.C.), that Sales Associate will forever lose his or her grandfathered status, and you will be required to pay us a Component Two Continuing Franchise Fee on his or her behalf.

    (3)    Technology Fee.

We reserve the right, upon 12 months' notice, to implement a third component to the Monthly Ongoing Fees, which fee would be known as the Technology Fee. If implemented, you will be required to pay us, on a monthly basis, a Technology Fee of up to $15 for each Sales Associate in your Office during the previous calendar month whether or not you actually collected a Technology Fee from your Sales Associates. If implemented, the Technology Fee will be due and will be considered late if not received by us by the 10th day of the month after the month the Office opens and by the 10th day of each month throughout the remainder of the term of the Franchise Agreement. If implemented, we will have the right to increase (by not more than $5 per year) or decrease the Technology Fee once in any calendar year.

If implemented, we would recommend that you, in turn, charge each of your Sales Associates a monthly Technology Fee.

    (4)    Failure to Establish or Collect Fees.

You understand and acknowledge that your failure to establish or require your Sales Associates to pay a monthly management fee, a Broker Service Fee, or if implemented, a technology fee, or your failure to actually collect such fees from some or all of your Sales Associates, does not relieve you of your obligation to remit all of the Monthly Ongoing Fees payable to us under this Agreement in a timely manner.

C.    **ANNUAL DUES.**

You agree to pay RE/MAX, LLC annual dues ("Annual Dues") in the amount of $410 (or such increased amount as provided below) for each Sales Associate (as defined in Subsection 6.I. below). Such dues will be payable by you for each Sales Associate as follows: (a) you must forward the first payment to RE/MAX, LLC, along with the membership profile form, within 5 days of the date such Sales Associate's license is first registered with the Office or the date the new Sales Associate is first qualified to engage in real estate services for the Office, whichever is earlier; and (b) all subsequent payments shall be due to RE/MAX, LLC on or before each anniversary date of the day the initial dues are paid respecting the Sales Associate. Although Sales Associates may be billed directly by RE/MAX, LLC for these dues, you understand, acknowledge, and agree that such direct billing will not relieve you of your obligation to timely pay RE/MAX, LLC the Annual Dues amount for each Sales Associate who fails to timely pay Annual Dues in full.

You understand and acknowledge that the Annual Dues payment obligation is intended to compensate RE/MAX, LLC for certain benefits and services afforded by it to you and your Sales Associates and to other sales associates who are affiliates of the RE/MAX Network, and that failure to pay Annual Dues in a timely manner may result in suspension of some or all of these benefits and services. The benefits and services currently provided by RE/MAX, LLC include, but are not limited to: inclusion of your office name, your personal name and the names of your Sales Associates in the RE/MAX web roster, and participation in the RE/MAX referral network, subscription and access to the RE/MAX Agent and Office Portal and the RE/MAX Internet based services provided through that

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

website; and access to the RE/MAX University catalog and the right to receive all free RE/MAX University programming and to receive and earn credit for RE/MAX University designation programming; eligibility for RE/MAX, LLC's performance awards; eligibility to receive referrals from LeadStreet and RE/MAX, LLC's Referral Department; rights to register, attend and participate in RE/MAX, LLC's annual convention or other programs; and maintenance and protection of the valuable RE/MAX Marks.

RE/MAX, LLC may, once in any calendar year, increase the amount of Annual Dues described above but not by more than 20% of the then existing dues amount.

You agree to make all payments due to RE/MAX, LLC under this Subsection or any other Section of this Agreement to RE/MAX, LLC, at P.O. Box 3907, Englewood, Colorado 80155, or to such other address as RE/MAX, LLC may designate during the Term of this Agreement.

D.     **ADVERTISING FUNDS.**

(1)     Regional Group Advertising Fund.

You agree to pay us—or our designee—a Regional Group Advertising Fund ("***RGAF***") fee of $100 per month with respect to each Sales Associate in your Office. This fee is due and will be considered late if not received by us by the 10th day of the month after the month the Office opens and by the 10th day of each month throughout the remainder of the Term of this Agreement. We may increase (but not by more than an additional $30 per month) or decrease the monthly RGAF fee once in any calendar year. You understand that your failure to collect this fee from some or all Sales Associates does not relieve you of your obligation to remit the required amount to us in a timely manner.

(2)     RE/MAX Advertising Development Fund.

A portion of the RGAF monthly fee due with respect to each Sales Associate may be allocated and paid over to the RE/MAX Advertising Development Fund, Inc. ("***RADF***") administered by RE/MAX, LLC.

(3)     Use of RGAF and RADF Funds.

All RGAF funds become the non-refundable property of the RGAF; all amounts allocated to the RADF become the non-refundable property of the RADF. All monies contributed to the RGAF or allocated to the RADF in any given fiscal year, including any interest, dividends, capital gains or other income earned on these monies, will be accounted for separately from RE/MAX, LLC's other funds. Any funds that are contributed to the RGAF or allocated to the RADF in a given fiscal year that are not spent by the end of that fiscal year will remain in a conservative investment account and may be carried over to the next year until these excess funds are spent for the advertising, promotional, and technology purposes (but excluding administrative costs) described in Subsection 9.C. A portion of your annual contributions will be used to pay administrative expenses reasonably related to the direction and implementation of the RGAF's and RADF's purposes. As part of those administrative expenses, both funds pay RE/MAX, LLC amounts equivalent to salaries, travel, rent and other expenses.

E.     **TEAM OFFICE FEES.**

You agree to pay us a non-refundable $1,000 Team Office Initial Fee for each Team Office you establish and a $500 non-refundable Team Office Renewal Fee for each Team Office that you renew. You also agree to pay a $100 monthly ongoing Team Office Fee, which fee will be due and will be considered late if not received by RE/MAX, LLC by the 10th day of the month after the Team Office opens and by the 10th day of each month throughout the remainder of the term of the Agreement.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

F.     **PAYMENT/LATE CHARGES/INTEREST**.

    (1)     Failure to Timely Make Payment.

If you fail to make any payments to us by their due date, you agree to pay us:  (a) a late charge equal to 20% of the amount due in the case of delinquent Annual Dues and 10% of the amount due in the case of all other delinquent fees and charges, or if such rates exceed the highest rate permitted by applicable law, then at the highest rate permitted by applicable law; and (b) with the exception of Annual Dues, interest on all amounts owed but unpaid at the rate of 1% per month compounded, or if such rate exceeds the highest rate permitted under applicable law, then at the highest rate legally permitted.  If we are ever deemed to have contracted for, charged or received interest on any overdue sums in an amount that exceeds the amount permitted under applicable law, then such excess amount shall be deemed intended for, and will be applied as, payment of outstanding fees or other amounts due under this Agreement and, if no such amounts remain outstanding, such excess shall be returned to you.

    (2)     Failure to Timely Submit Reports.

If you fail to submit any reports by their due date, you agree to pay us a late charge of $100 per day until the reports are submitted in compensation for the additional administrative costs and expenses we incur as a result of the late submission (see also Section 10).

    (3)     Submission of Payments.

You agree to comply with any requirement we may impose to the effect that certain or all fees, dues and charges specified in this Section 6 be paid by wire transfer, direct deposit, electronic funds (“***EFT***”) or automated clearinghouse (“***ACH***”) transfer, or by such other means and in accordance with such procedures as we may specify from time to time.

G.     **APPLICATION OF PAYMENTS**.

When we receive a payment or a partial payment required under this Section 6, we have the unfettered right to apply it as we see fit to any past due indebtedness of yours under this Section 6, including late charges or interest due, all without regard to how you designate or direct that a particular payment be applied.  If we are ever deemed to have contracted for, charged or received late payments or interest on any overdue sums in an amount that exceeds the amount permitted under applicable law, then such excess amount shall be deemed intended for, and will be applied as, payment of outstanding fees or other amounts due under this Agreement and, if no such amounts remain outstanding, such excess shall be returned to you.

H.     **SUSPENSION OF SERVICES**.

If you fail to make any payments to us as required under this Agreement then, in addition to the assessment of late charges and interest as set forth above, we shall have the right to suspend, during such period of delinquency, any or all benefits and services afforded you as a RE/MAX franchisee, or the Sales Associates (as defined below) affiliated with your Office.  Among other remedies, we will have the right to: remove you from the RE/MAX web roster and the remax.com website; deny you access to the RE/MAX Agent and Office Portal and RE/MAX University; suspend  your subscription to the RE/MAX University catalog and other publications; declare you ineligible for RE/MAX, LLC performance awards as well as referrals from LeadStreet or RE/MAX, LLC’s Referral Department; and bar you from registering, attending or participating in RE/MAX, LLC’s annual convention and other conferences.  Suspension of these or any other benefits and services shall not be an exclusive remedy and shall not in any way affect our rights to receive or collect all outstanding fees, dues and other amounts owed by you or to terminate this Agreement because of your failure to make payments required under this Agreement.

I.     **SALES ASSOCIATE DEFINED**.

For purposes of this Agreement, “***Sales Associate***” means each person who possesses a state real estate license that is registered with the Office or any Team Office including, but not limited to, sales associates, broker associates, brokers, managers, licensed administrators and/or each designated or managing broker of record.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

J.      **RE/MAX GOLD PLAN.**

As an acknowledgement of their many years with the RE/MAX organization, Sales Associates that are at least 65 years old, and that have been in the RE/MAX system for at least 10 consecutive years, and who are no longer able, or no longer desire, to devote a significant portion of their time and energy to real estate, may be eligible to receive a reduction in both Monthly Ongoing Fees and Regional Group Advertising Fund fees in return for their continued affiliation with the RE/MAX organization, albeit on less than a full-time basis; this program is known as the RE/MAX Gold Plan ("RE/MAX Gold Plan"). If you would like your eligible Sales Associates to participate in this program, you must sign the current version of the RE/MAX Gold Plan Letter Addendum.

K.      **SURVIVING FINANCIAL OBLIGATIONS.**

In the event of an early termination of this Agreement by RE/MAX, LLC, for any reason other than pursuant to mutual consent, prior to the conclusion of the Term or any applicable renewal thereof ("*Early Termination*"), you shall immediately become obligated to pay us for lost future revenue ("*Lost Future Revenue*"). Lost Future Revenue shall consist of all amounts which you would have been obligated to pay as Monthly Ongoing Fees, Annual Dues, and Regional Group Advertising Fund fees, from the date of Early Termination through what would have been the end of the Term. We and you acknowledge that it would be impracticable or extremely difficult to calculate the actual amount of Lost Future Revenue payable by you, and that the following method of calculation represents a fair and reasonable estimate of foreseeable Lost Future Revenue: Lost Future Revenue shall be equal to the combined monthly average of Monthly Ongoing Fees, Annual Dues, and Regional Group Advertising Fund fees payable under this Agreement from the effective date of this Agreement through the date of Early Termination, multiplied by the number of months (or partial months) remaining in the Term of this Agreement. The present value of the total of these amounts calculated at a discount rate of 8%, assuming payment is made within 30 days of Early Termination, shall constitute our Lost Future Revenue.

L.      **OUTSIDE LICENSED AGENTS.**

For purposes of the provisions of this Section 6 of this Agreement, "*Outside Licensed Agents*" means each person who possesses a state real estate license that is *not* registered with the Office or any Team Office, who is *not* shown in the RE/MAX web roster as an affiliate of the RE/MAX Network and is otherwise *not* authorized to use the RE/MAX Marks, but who is providing any real estate related services on a regular basis that benefit any Sales Associate or the Office or any Team Office, and who is linked or tied to any Sales Associate or the Office or any Team Office in such a way that they make unauthorized use of or benefit directly or indirectly from the RE/MAX Marks. Examples of licensed agents who are not licensed with the Office or any Team Office who shall be deemed to be linked or tied to a given Sales Associate or to the Office or any Team Office through such Sales Associate and thus, Outside Licensed Agents attributable to such Sales Associate include, but are not limited to, those who:

(1)   are named or pictured in advertising or personal promotion materials that include such Sales Associate's name, photograph or team name and the name of the Office or any Team Office or any of the RE/MAX Marks; or

(2)   have one or more websites that name or identify such Sales Associate or such Sales Associate's team or the name of the Office or any Team Office or that have direct links to another website that displays the name of such Sales Associate, such Sales Associate's team name, or the name of the Office or of any Team Office or displays any of the RE/MAX Marks; or

(3)   use business cards, promotional materials or other items that include the name of such Sales Associate, the Sales Associate's team, the Office or any Team Office or any of the RE/MAX Marks; or

(4)   are named or identified by such Sales Associate in any manner that indicates or suggests the existence of an established, regular or continuing working relationship between or involving such unaffiliated licensed person and such Sales Associate, the Office or any Team Office or any other connection or association with the RE/MAX Network or the RE/MAX Marks through such Sales Associate; or

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(5) are managed by such Sales Associate or are compensated by such Sales Associate or by any other person employed by or affiliated with the Office or any Team Office or are otherwise directly or indirectly subject to the direction or control of such Sales Associate.

## M.   OUTSIDE LICENSED AGENT PAYMENTS.

Outside Licensed Agents under the definition set forth above in Subsection 6.L. are *not* authorized under the Franchise Agreement to use or to benefit in any way from the RE/MAX Marks or from use of the name of your Office or of any Team Office or from use of the name of any team of Sales Associates known to be associated with you or your Office or any Team Office and, accordingly, they should *not* be so linked or tied to you or to the Office or to any Team Office or to any Sales Associate (as defined in Subsection 6.I. above). All such Outside Licensed Agents shall be converted to Sales Associates or, in the alternative, the links and ties that define them or connect them to the RE/MAX Marks or to you or the Office or to any Team Office or to any Sales Associate shall be broken, eliminated or discontinued.

Continued tolerance by you of Outside Licensed Agents for a period of more than 10 days from the date of your receipt of a written demand from RE/MAX, LLC to either eliminate the links or ties with such Outside Licensed Agents or convert them to Sales Associates shall be deemed a material default and grounds for termination of this Agreement pursuant to Section 13. Without waiving such right to terminate, so long as any Outside Licensed Agent continues to function in that capacity, you must pay, on behalf of each such Outside Licensed Agent, the Monthly Ongoing Fees (as specified in Subsection 6.B. above), the Annual Dues (as specified in Subsection 6.C. above) and the Regional Group Advertising Fund fee (as specified above in Subsection 6.D. above).

## 7.   MINIMUM AGENT COUNT.

You agree to have the following minimum number of Sales Associates in your Office by the dates and during the periods set forth below ("*Minimum Agent Count*"):

(1)     (See Renewal Addendum) Sales Associates by the end of the first 12-month period after the Agreement Date and during each month thereafter through the 24th-month after the Agreement Date;

(2)     (See Renewal Addendum) Sales Associates commencing the first day following the expiration of the 24-month period following the Agreement Date and during each month thereafter through the 36th-month after the Agreement Date; and

(3)     (See Renewal Addendum) Sales Associates commencing the first day following the expiration of the first 36-month period after the Agreement Date and during each month thereafter through the remainder of the Term.

Only Sales Associates who have not been affiliated with the RE/MAX Network of real estate offices for at least 12 months prior to their affiliation with you will be counted towards the satisfaction of your Minimum Agent Count requirements set forth above.

Notwithstanding any failure by you to meet your Minimum Agent Count, you will not be excused from the payment of, and you agree to pay, all Monthly Ongoing Fees, advertising fees and contributions and Annual Dues to us as if you had met your Minimum Agent Count.

## 8.   BUSINESS IMAGE AND OPERATING STANDARDS.

### A.   APPEARANCE OF OFFICE.

You agree to maintain the appearance of the Office consistent with the image of a RE/MAX office business as a modern, clean, attractive and efficiently operated facility. You agree to take steps as reasonably required from time to time to maintain such appearance and efficient operation, including, without limitation, interior and exterior repair and cleaning of the premises of the Office; replacement of worn out or obsolete leasehold improvements, fixtures, equipment or signs; and periodic decorating.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

B.    **SYSTEM STANDARDS AND OPERATIONS MATERIALS.**

We will issue to you during the Term of the Franchise one or more printed or electronic copies of operations materials containing trademark, graphic and other standards, recommendations and other information relating to your obligations under this Agreement, your use of the RE/MAX Marks and the general operation of the Office (the "*Operations Materials*"). The Operations Materials clearly demark and identify those elements that are mandatory and those that are recommended to you and provided solely as a resource. The entire contents of the Operations Materials will remain confidential and our property and must be returned to us upon transfer, expiration or termination of this Agreement. We will have the right to add to and otherwise modify the Operations Materials from time to time, if deemed necessary to improve the standards of service or quality or the efficient operation of the Office, to protect or maintain the goodwill associated with the RE/MAX Marks or to meet competition. Such additions or modifications may be made by amendment or supplement to the Operations Materials or by bulletins, notices or other written or electronic materials as we may publish from time to time. No such addition or modification, however, shall alter your fundamental status and rights under this Agreement.

You acknowledge and agree that the development and operation of the Office in accordance with the System, this Agreement and the Operations Materials is essential to preserve the reputation and high standards of quality and service of RE/MAX offices and the goodwill associated with the RE/MAX Marks. You further acknowledge and agree that the mandatory elements of the System, containing standards, procedures, policies and guidelines contained in the Operations Materials, have been established for the purpose of preserving such reputation, standards and goodwill, but do not, and are not intended to, govern or control the day-to-day affairs, activities or business of the Office or the means and manner by which you conduct the operations of the Office, which shall always be your responsibility and subject to your discretion and control.

C.    **COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES.**

You acknowledge that it is your sole responsibility to secure and maintain in force all required licenses, permits and certificates relating to the operation of the Office and to operate the Office in full compliance with all applicable federal, state, and local laws, ordinances and regulations, including, without limitation, those relating to: real estate service businesses, brokers and salesmen; occupational hazards; health, workers' compensation and unemployment insurance; the Americans with Disabilities Act; the Real Estate Settlement Procedures Act (commonly known as RESPA); Fair Housing Laws; federal and state laws that regulate data security and privacy (including but not limited to the use, storage, transmission, and disposal of data regardless of media type); the CAN-SPAM Act; the Telephone Consumer Protection Act; the Telemarketing Sales Rule, as well as other federal and state anti-solicitation laws regulating phone calls, spamming, and faxing.

All of your advertising and promotion, and the advertising and promotion of your Sales Associates, and any other advertising and promotion emanating from your Office, must be completely factual and conform to the highest standards of ethical advertising. In all of your dealings with clients, customers, suppliers, us and the public, you must adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to promptly respond to all complaints received from your customers, clients or other individuals, in an attempt to resolve any disputes in a reasonable business manner. You agree to refrain, and to ensure that your Sales Associates and any other persons affiliated with your Office refrain, from any business or advertising practice which may be injurious to our business and the goodwill associated with the RE/MAX Marks and other RE/MAX offices. You agree to notify us in writing within 5 days of the receipt of any notice of violation of any law, ordinance, or regulation relating to the Office, or the commencement of any action, suit or proceeding, or of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect you or your financial condition or the operation of the Office.

D.    **INSURANCE.**

You shall at all times during the Term of the Franchise, and any renewal thereof, maintain in force at your sole expense the following insurance coverage:

(1)    Comprehensive general liability insurance insuring against claims for bodily and personal injury, and death and property damage, caused by or occurring in conjunction with the operation of the Office or otherwise in conjunction with the conduct of business by you pursuant to the Franchise, in the face amount of not less than $2,000,000 per occurrence and annual aggregate. If you are unable to obtain

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

general liability insurance in the face amount of $2,000,000, then you must obtain comprehensive general liability insurance in the face amount of not less than $1,000,000 per occurrence and annual aggregate, as well as commercial umbrella liability insurance in the face amount of not less than $1,000,000 per occurrence and annual aggregate;

        (2)      Errors and omissions insurance in the face amount of not less than $1,000,000 per claim and annual aggregate;

        (3)      Automobile liability insurance covering each vehicle titled or leased in the name of the Franchise or any of its Owners and used at any time for the business of the Franchise. Each such automobile liability insurance policy must have (i) a combined single limit of liability for bodily injury and property damage of at least $500,000; or (ii) bodily injury liability insurance having limits of at least $250,000 per person and a minimum of $500,000 per occurrence and property damage liability insurance having limits of at least $100,000 per occurrence;

        (4)      A commercial, hired and non-owned automobile policy in the face amount of at least $1,000,000 combined single limit of liability for bodily injury and property damage; and

        (5)      Any additional policies and coverage that may be required by law—in amounts prescribed by law—such as, but not limited to, workers' compensation insurance for employees.

All insurance policies must commence the day the Office begins business operations and must name RE/MAX, LLC (and its officers, managers, directors and employees) as an additional insured.

All insurance policies—with the exception of the errors and omissions liability insurance policy—must contain a waiver by the insurance carrier of all subrogation rights against RE/MAX, LLC and other parties covered by the insurance and must contain a provision that RE/MAX, LLC receive prior written notice of termination, expiration, cancellation, or modification of any such policy.

All insurance coverage required pursuant to this Subsection must be maintained under one or more policies of insurance—and contain such terms and conditions—as specified from time to time by RE/MAX, LLC. You agree to obtain insurance policies with an insurance company that has an A.M. Best's rating of at least a B- and an A.M. Best's financial size category of at least VI.

We may from time to time increase the minimum amount of coverage required under any policy, and require different or additional kinds of insurance to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances.

With respect to the comprehensive general liability and errors and omissions insurance noted above, you must secure endorsements covering each of your Sales Associates under such policies or, in the alternative, you must ensure that each Sales Associate secures such insurance on his or her own behalf. You must also ensure that each Sales Associate in your Office obtains automobile liability insurance covering each vehicle used at any time by the Sales Associate for business purposes and use your best efforts to ensure that each such policy i) names RE/MAX, LLC (and its respective officers, managers, directors, and employees) as an additional insured; ii) contains a waiver by the insurance carrier of all subrogation rights against RE/MAX, LLC and other parties covered by the insurance; and iii) provides the same amount of coverage as you are required to obtain as set forth in Subsection 8.D.(3) above; and iv) contains a provision that RE/MAX, LLC receive prior written notice of termination, expiration, cancellation or modification of such policy.

RE/MAX, LLC uses a third party vendor, currently MyCOI, to track certificates of insurance obtained by franchisees and to confirm that the insurance policies they obtain meet all of RE/MAX, LLC's requirements. You must register and provide information related information to MyCOI, or such other third party vendor that RE/MAX, LLC may designate, as well as sign and abide by MyCOI's terms of use (or the terms of use or user agreement of such other third party vendor that RE/MAX, LLC may designate). You must also authorize your insurance provider to work with and provide your insurance related information to this vendor. You will be required to furnish RE/MAX, LLC, via its third party insurance tracking vendor, a copy of the certificate of or other evidence of the procurement, renewal or extension of each above referenced insurance policy at least 30 days prior to the effective

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

date of such procurement, renewal or extension. If you at any time fail or refuse to maintain in effect any insurance coverage required by us, or to furnish satisfactory evidence of such insurance, we may, at our option and in addition to any other rights and remedies we may have under this Agreement, obtain such insurance coverage on your behalf, although we are under no obligation to do so. You agree to fully cooperate with us and our third party vendor in our efforts to obtain such insurance policies, promptly execute any and all forms or instruments required to obtain any such insurance, allow any inspections of the premises of the Office which are required to obtain such insurance, and reimburse us, on demand, any costs and premiums we may incur. Should RE/MAX, LLC cease using a third party vendor, you agree to provide each required certificate of insurance directly to RE/MAX, LLC.

If you are operating a commercial franchise, RE/MAX, LLC may, in its discretion, require you to have additional insurance coverage in additional amounts.

We recommend that you obtain and maintain cyber liability insurance, cybercrime insurance, media liability insurance, and employment practices liability insurance, and that you consult with an insurance professional to determine the level of coverage that would be best for your Office. Where available, such additional insurance policies shall name RE/MAX, LLC (and its officers, managers, directors and employees) as an additional insured. You should also consult with an insurance professional regarding whether there are any additional insurance policies that you should obtain.

With regard to errors and omissions insurance, you agree to purchase an extended reporting period endorsement (also known as tails insurance) covering a period of 3 years after the expiration, termination or transfer of this Agreement, which endorsement shall be consistent with all of the conditions set forth in this Subsection for errors and omissions insurance coverage, including without limitation, the requirement to name RE/MAX, LLC as an additional insured. You agree to provide RE/MAX, LLC with evidence that you have obtained such errors and omissions insurance within 30 days of the expiration, termination, or transfer of the Agreement. You agree that if you fail to obtain appropriate errors and omissions coverage, RE/MAX, LLC has the right—but not the obligation— to obtain it on your behalf, and that you must promptly reimburse RE/MAX, LLC for the cost thereof as well as related administrative expenses.

Your obligation to obtain and maintain the insurance described above shall not be limited in any way by reason of any insurance maintained by us, nor will your performance of such obligations relieve you of any obligations under Section 5 of this Agreement.

E.    **ORGANIZATION OF FRANCHISE OWNER.**

If you are a Business Entity, you represent and warrant to us that you are duly organized and validly existing in good standing under the laws of the state of your incorporation, organization, or registration, that you have the authority to execute, deliver and carry out all of the terms of this Agreement, and that during the Term of this Agreement the only business you (i.e., the Business Entity) will conduct will be the development, ownership and operation of the Office. You and each Owner represent, warrant and agree that all "interests" (defined in Subsection 12.B. below) in Franchise Owner are owned in the amount and manner described in Exhibit A, that all information set forth on Exhibit A is true and accurate and that the sole proprietor, shareholders, partners, members, officers, managers, directors and other individuals who have legal or equitable ownership in—or the legal right to control—the Business Entity are fully described therein. You and each Owner further represent, warrant and agree to amend Exhibit A to keep it accurate and current at all times, and to promptly provide us with all amendments of Exhibit A. You shall provide us with copies of your certificate of incorporation, registration or articles of organization, as the case may be, as well as copies of your by-laws, partnership or operating agreements, buy-sell agreements and any other relevant documents we request. The articles of incorporation, by-laws, articles of organization, partnership agreement and other organizational documents of such Business Entity shall recite that the issuance and transfer of any interest therein is restricted by the terms of Section 12 of this Agreement and all issued and outstanding stock certificates or certificate of membership interest or other evidence of ownership of any such Business Entity shall bear the following clause restricting transfer:

"The transfer of this stock (or other interest) is subject to the terms and conditions of the franchise agreement between this corporation (or other entity) and RE/MAX, LLC. These restrictions prohibit transfer without the prior written approval of RE/MAX, LLC."

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

F.      **MANAGEMENT OF THE OFFICE.**

You or one of your principal Owners shall agree at all times to hold—or to secure the services of an individual who holds—a valid state real estate broker license or such other state license as may be required to act as the designated or managing broker of record (***"real estate broker license"***), under whose license the Office will be conducted (the "***manager***"). Such person shall devote his or her full time and best efforts to the management and supervision of the Office. You agree to ensure that all of your Sales Associates are supervised by the manager, and that the manager will be charged with responsibility for continuing personal guidance, oversight, day-to-day management, orientation, instruction and supervision of your Sales Associates, and for receipt and timely, appropriate processing of requests, reports or complaints respecting the conduct and professional performance of your Sales Associates. You and the manager shall scrupulously observe and adhere to your state's regulations affecting real estate brokers and salesmen. You agree to respond promptly to customer complaints and shall take such other steps as may be required to ensure positive customer relations. You, the manager, and each Owner that holds a real estate broker license shall maintain registration of such real estate broker license(s) with the Office, and with no other real estate brokerage, absent express written permission from RE/MAX, LLC.

G.      **TRAINING.**

You or one of your principal Owners shall attend in its entirety and successfully complete, prior to the opening of the Office or within 30 days of the Agreement Date, whichever is sooner, the next scheduled RE/MAX management training course we conduct for new RE/MAX office franchisees in Denver, Colorado or such other place as we shall reasonably designate. You may send one or more people from the Office free of charge to the training program, although you will be responsible for all travel, meal, lodging, and entertainment expenses you or anyone else from the Office incurs while attending the training program.

In addition, if required by us, prior to renewal of the Franchise, you or one of your principal Owners shall, at your expense (including the cost of the course and all travel, meal, lodging, and entertainment expenses), complete the following course: RE/MAX 501: Maximizing Your Office Potential; and/or such other training deemed necessary by us (or provide us with evidence that you or such Owners have satisfied requirements equivalent to such course or training).

H.      **PROFESSIONAL MEMBERSHIPS.**

You agree that you and each of your Sales Associates will join and remain a member in good standing and comply with the by-laws and rules and regulations of a local Board of REALTORS® (or comparable organization) and, where available, you will become and remain a participant in a board owned multiple listing service. You also agree that you and your Sales Associates will abide by the Code of Ethics of the National Association of REALTORS®.

I.      **RE/MAX REFERRAL SYSTEM.**

You acknowledge the importance of the RE/MAX Referral System as an integral part of the System and to the success of RE/MAX offices. Accordingly, you will refer requests for real estate services in another city to a RE/MAX office for that city. If there is no RE/MAX office located in such city, you will refer each such request to RE/MAX, LLC's Referral Department. We will establish procedures and make appropriate forms available to facilitate referrals between you and other RE/MAX offices and RE/MAX Affiliates.

You agree not to offer, or allow any of your Sales Associates to offer to members of the RE/MAX organization, or to engage or to allow any of your Sales Associates to engage in the business of offering to consumers or other industry practitioners, any office or agent locator or referral service which uses the RE/MAX web roster (or any other RE/MAX referral roster) or which competes with the services made generally available by RE/MAX, LLC to the RE/MAX Network as a benefit of affiliation. This provision shall not be construed to prohibit or discourage (i) any RE/MAX Affiliate from referring a local real estate brokerage customer or client to any other RE/MAX Affiliate anywhere in the world; (ii) the creation of RE/MAX agent to RE/MAX agent reciprocal referral relationships between two geographic areas or two cities; (iii) any RE/MAX Affiliate from advertising or promoting himself/herself as a provider of real estate services in his/her local real estate market; or (iv) any RE/MAX Affiliate from inviting or soliciting referrals to himself/herself for real estate brokerage services in his/her local market area.

J.       **BROKER/OWNER CONFERENCES, MEETINGS AND RETREATS.**

You are strongly encouraged to actively participate in and attend all Broker/Owner conferences, meetings and retreats we schedule, and you agree to pay any associated registration fees.   You agree that you are responsible for all travel, meal, lodging, and entertainment expenses you or anyone else from your Office incurs while attending a Broker/Owner conference, meeting or retreat.

K.       **SUPPLIES AND PROMOTIONAL MATERIALS.**

RE/MAX, LLC prescribes standards respecting the nature and quality of the supplies and promotional materials that bear the RE/MAX Marks that you use in the operation and promotion of the Office.  Although neither you nor your Sales Associates are required to purchase supplies or promotional materials from a source approved by RE/MAX, LLC, we encourage you to do so.  If you or your Sales Associates obtain supplies or promotional materials from sources other than a source approved by RE/MAX, LLC, you agree to ensure that they are of at least the same quality as are available from sources approved by RE/MAX, LLC.  You shall ensure that all such materials and supplies, including without limitation, all advertising, promotional and marketing materials and all stationery and signage that you use or that are used by your Sales Associates comply with the standards and guidelines established by RE/MAX, LLC for proper use of the RE/MAX Marks including, without limitation, the standards and guidelines set forth in the Trademark Manual.  You understand and agree that RE/MAX, LLC does not assume any liability for the acts or omissions, or guaranty the performance, of any supplier, whether approved or not.

L.       **MODIFICATIONS AND IMPROVEMENTS TO SYSTEM.**

We may change the System or any part of the System at any time, and such changes shall become part of the System referred to in this Agreement provided, however, that changes to the mandatory elements of the System shall pertain solely to the protection and goodwill of the RE/MAX Marks. Any improvements in the System that may be developed by you shall be dedicated, conveyed to and become the sole and exclusive property of RE/MAX, LLC, which will have the right to adopt and perfect such improvements without compensation to you.

M.       **REAL ESTATE LISTINGS AVAILABLE VIA REMAX.COM.**

In order to promote and enhance the RE/MAX name and to encourage members of the public to use RE/MAX real estate services, RE/MAX, LLC has developed and hosts the website remax.com.  You understand and acknowledge that one of the purposes of remax.com is to encourage members of the public to use remax.com as a source of information for their real estate needs and that the success of remax.com in attracting consumers depends on full participation by all RE/MAX offices.  Accordingly, you agree that unless instructed otherwise by the client, you will give any authority, consent or instructions required, and otherwise use your best efforts, to ensure that all of your Office real estate listings, including those of your Sales Associates, are made available to remax.com and that neither you nor your Sales Associates will decline, or opt out of, any opportunity to have each such listing entered on or forwarded to remax.com.  With respect to pictures or other media that you supply to us (including those intended for use in listings on remax.com), to the extent the copyright of any such picture or other media is owned by you, you grant us a fully paid up and royalty-free perpetual and irrevocable license and right to use and sublicense such pictures and other media for any purpose we deem appropriate in any media now in existence or hereafter created.  To the extent that you do not own the copyright in such pictures or other media, you represent and warrant that you have permission to use such pictures and other media and to authorize the uses contemplated by this Subsection, and agree to indemnify and hold us and our vendors and service providers harmless against any claims by any third party that our use, or any use by our vendors or service providers engaged in at our direction, infringes upon such third party's rights.  RE/MAX, LLC reserves the right to discontinue this requirement at any time, and may modify or discontinue the remax.com URL.

N.       **MAINTAINING INDEPENDENCE, AVOIDING CONFUSION AND ADVERTISING COMMISSIONS.**

You should maintain the independence of your Office in determining the commission rates charged. You and your Sales Associates shall refrain from any comment, advertising, or other conduct that could lead consumers to believe that the commission rates or fees of RE/MAX offices or agents are uniform, set at any specific level, or are not negotiable. You may set commission rates or fees independently and advertise those rates or fees. Subject to your rights and responsibilities to supervise your Sales Associates, you may allow your Sales Associates to set, or

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

prohibit your Sales Associates from setting, commission rates or fees independently, and you may allow your Sales Associates to advertise those rates or fees, or prohibit them from doing so. In the event that you or your Sales Associates elect to advertise commission rates or fees, or allow others affiliated with your Office to advertise commission rates or fees, the advertisement shall also include the following notice to the public in a typeface at least one-half the size of the largest typeface used in the advertisement to specify the commission rates or fees being offered: "Different commission rates, fees and listing and marketing services may be offered by other RE/MAX Franchisees and sales associates serving this market area." In addition, it shall be the responsibility of the party advertising commission rates or fees to ensure that potential clients fully understand the listing and marketing services that will be provided by that party in the market area.

### O.      COVENANT CONCERNING ANTI-TERRORISM.

You and your Owners agree to comply with and/or to assist us to the fullest extent possible in our efforts to comply with Anti-Terrorism Laws (as defined below). In connection with such compliance, you certify, represent, and warrant that neither your nor your Owner's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws, and that neither you nor your Owners are otherwise in violation of any of the Anti-Terrorism Laws. "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future U.S. federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war. Any violation of the Anti-Terrorism Laws by you, any of your Owners, or any of your or your Owners' employees, or any "blocking" of your or any of your Owners' assets under the under the Anti-Terrorism Laws, shall constitute grounds for immediate termination of this Agreement and any other agreement that you or any of your Owners has entered into with us (or any of our affiliates) in accordance with the termination provisions of this Agreement.

You shall notify RE/MAX, LLC in writing immediately of the occurrence of any event that renders the foregoing certifications, representations and warranties of this Subsection 8.O. incorrect.

### P.      COMPLIANCE WITH THE UNITED STATES FOREIGN CORRUPT PRACTICES ACT.

You and your Owners represent that you are familiar with the United States Foreign Corrupt Practices Act, 15 U.S.C. §78dd-2 (the "FCPA"), and the purposes of the FCPA. In particular, you and your owners understand the FCPA's prohibition of the payment of money or the gift of anything of value, either directly or indirectly, to a foreign official to influence the foreign official in his or her official capacity, to induce the foreign official to do or omit to do an act in violation of his or her lawful duty, or to secure any improper advantage in order to assist in obtaining or retaining business for or with, or directing business to, any person. Currently a copy of the FCPA may be found on the Internet at: https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2012/11/14/fcpa-english.pdf. You and your Owners represent and warrant that you will take no action that would constitute a violation of the FCPA or any law of similar effect or nature. Further, you and your Owners represent and warrant that you are, and shall remain, in compliance with all applicable legal requirements and RE/MAX, LLC's policies against corrupt business practices, against money laundering and against facilitating or supporting persons who conspire to commit crimes or acts of terror against any person or government. You agree to immediately notify us in writing of the occurrence of any event which renders the representations and warranties of this subsection incorrect.

## 9.      GUIDANCE AND ASSISTANCE.

### A.      TRAINING.

You or your Owner responsible for the Office will be provided with a mandatory 4 ½ day training program at the headquarters of RE/MAX, LLC, or at such other location as RE/MAX, LLC may designate, prior to the opening of the Office. The training program will cover the broad operational spectrum of a RE/MAX office franchise including, but not limited to: office and business establishment, recruiting and growth methods, fiscal management, and exposure to approved suppliers and standards. Teaching methods and tools utilized will include: course workbook, interactive flash drive, the recruiting presentation series, extensive audio and visual materials, slides and overhead usage. Other than materials of general usage, such as the slide presentation, you or your Owner attending the training program will be entitled to use the materials and forms distributed on a loan basis only. These materials must be returned to us upon termination or expiration of this Agreement.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

B.   **OPENING ASSISTANCE.**

Prior to the opening of the Office, we will make available to you standards, operating procedures, policies and guidelines to familiarize you with the System and to assist you in the opening of the Office. These materials will also provide you with guidelines for standardization of signs, letterheads, sales, promotion, office design and other similar materials. In addition, if requested, we will assist you, at your expense, with your open house, office design and layout, conversion of sales staff, and with your initial publicity and advertising campaign.

C.   **ADVERTISING AND PROMOTION.**

We will collect monies paid to, control and administer the Regional Group Advertising Fund described in Subsection 6.D. of this Agreement. Although the specific use and allocation of monies in the RGAF shall be determined by RE/MAX, LLC in its sole discretion, all monies in the RGAF, including any interest, dividends, capital gains or other income, will be used for the preparation and placement of local or regional advertising materials, programs and public relations activities, and technology related services (which include, without limitation, professional services pertaining to LeadStreet, such as web hosting, licensing, and consulting fees), as well as related administrative and maintenance costs. Advertising may be disseminated through television, radio, billboard, magazine, newspaper, Internet and other media campaigns.

We will also collect monies paid to, control and administer the RE/MAX Advertising Development Fund described in Subsection 6.D. of this Agreement. Although the specific use and allocation of monies in the RADF shall be determined by RE/MAX, LLC in its sole discretion, all funds within the RADF, and any interest, dividends, capital gains or other income earned on such funds, will be accounted for separately from other funds of RE/MAX, LLC and will be spent on technology related services, items related to the creation, distribution and placement of national or pan-regional advertising, as well as related maintenance and administrative costs. The uses may include, by way of example: (i) contributing, together with some or all of the advertising funds of Independent Regions or regions directly operated by RE/MAX, LLC, to national or pan-regional creative development and media purchases; (ii) special, high profile advertising opportunities; or (iii) technology related services (which may include, without limitation, expenses related to the development, operation, and maintenance of the remax.com website, LeadStreet (a proprietary lead management solution), and the RE/MAX Design Center).

You understand that the Regional Group Advertising Fund and the RE/MAX Advertising Development Fund administered by us are intended to maximize general public recognition of the RE/MAX Marks and the System and services offered by RE/MAX offices. We do not undertake any obligation to ensure that expenditures by the Regional Group Advertising Fund or the RE/MAX Advertising Development Fund (together, referred to as the "*Funds*") are proportionate or equivalent to the contribution to these Funds by RE/MAX offices or that any RE/MAX office will benefit directly or in proportion to its contribution to these Funds from the development of advertising and marketing materials or the placement of advertising by these Funds. We do not have any fiduciary obligations to you or any other RE/MAX office in connection with the establishment of these Funds or the collection, control or administration of monies paid into them and we expressly disavow the existence of any such fiduciary relationship.

D.   **CONSULTATION AND EDUCATIONAL COURSES.**

We will make available to you at the Office, on a reasonable basis, consultation and guidance relating to the operation of the Office. We will have the right to charge you, and you agree to pay our per diem rate and all travel, lodging, meal and related expenses incurred by us for any consulting services provided to you beyond the services ordinarily provided by us to RE/MAX offices. The time and frequency of any such services will be subject to the availability of our personnel. In addition, from time to time, various educational courses and other assistance will be made available in such areas as fiscal management, office operations, recruiting and retention of Sales Associates and financial planning.

E.   **SYSTEM RECOGNITION AND PROMOTION.**

We will encourage the use of the RE/MAX Marks and the System and RE/MAX real estate services on a national and international basis. To this end, we have established and maintain a national and international referral system which will be made available to you and in which you will be obligated to participate.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

F.    **CONVENTIONS AND SEMINARS.**

You will be entitled to attend RE/MAX, LLC's annual conventions, as well as occasional educational seminars it holds, designed to enhance the image of the System, assist franchisees in recruiting potential Sales Associates and provide a forum for the exchange of ideas and information on the operation of RE/MAX offices. Attendance is highly recommended. If you decide to attend any of these conventions or seminars, you will be responsible for payment of all travel, meal, lodging, and entertainment expenses, as well as a registration fee, which currently ranges from $195 - $800 per person (the registration fee includes educational, conference and registration materials). Nominal fees or charges may also be assessed for a variety of other social functions, as well as for educational and certification classes for obtaining professional credits.

G.    **PROFESSIONAL PUBLICATIONS AND MATERIALS.**

You will be entitled to receive from time to time any publications and materials produced and distributed by us to recognize the achievements of RE/MAX Sales Associates and to highlight recent and future events that are of interest to RE/MAX Affiliates. Additionally, we currently make available to all RE/MAX Affiliates via the RE/MAX Agent and Office Portal, a roster of approved suppliers as well as the RE/MAX web roster (an online referral roster). All information in the RE/MAX web roster and roster of approved suppliers is owned by us and is considered confidential and proprietary.

10.    **RECORDS AND REPORTS.**

A.    **ACCOUNTING AND RECORDS.**

During the Term, you agree to establish and maintain record keeping and accounting systems conforming to the requirements prescribed by us from time to time. All books and records of the Office shall be maintained at the Premises.

B.    **REPORTS.**

You agree to furnish us in the form we prescribe from time to time:

(1)    Sales Associates.

Within 5 days after the close of each calendar month a statement listing each Sales Associate whose license is registered with your Office or any Team Office and, for each Sales Associate, the gross commissions earned and the number of transactions closed.

a.    Calculating Amounts Due in Absence of Reports.

In the event that you fail to timely submit such statement (i) the total number of Sales Associates for purposes of calculating RGAF contributions for the related month shall be deemed to be the average of the number of Sales Associates reported for such calendar month in each of the last 2 years, plus 10%, and (ii) the Monthly Ongoing Fees due from you for the related month shall be deemed to be the average of the last 2 Monthly Ongoing Fees received from you, plus 10%.

b.    Failure to Report Sales Associates a Material Default.

A failure to report Sales Associates in a timely manner shall be deemed a material default of an essential provision of this Agreement that gives us the option of pursuing termination of this Agreement pursuant to Section 13. Alternatively, we may accept payment of back fees and dues, plus any and all applicable late charges and interest, pursuant to Subsection 6.F. You agree to pay the back fees and dues, plus any and all applicable late charges and interest, if we offer that alternative to termination.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

c.      Reporting Terminated Sales Associates.

Immediately upon a Sales Associate's termination, you must furnish us with a status change form (or such other form as we may designate) reflecting the termination. If you fail to timely report the termination of a Sales Associate, you will be billed for, and required to pay, Monthly Ongoing Fees and RGAF fees for each month the Sales Associate was not in your Office until the date you report the Sales Associate terminated.

(2)      Financial Statements.

Within 60 days after the close of your fiscal year for federal income tax purposes, a financial statement containing a balance sheet and results of operations, including gross sales and revenues for such year; and

(3)      Other Reports.

Such other reports as we may prescribe from time to time. All reports, financial statements and information shall be on forms prescribed or approved by us and shall be verified and signed by you and your chief financial officer.

### C.      OTHER INFORMATION.

No reports and records or other information supplied to us shall be considered confidential. We shall have the right to use information derived from that supplied by you for our own business purposes, to disclose such information as may be required by law and governmental authority, and to aggregate such information with other franchise information and disclose such aggregated information as we deem appropriate. You will provide us and/or cooperate with us in collecting other information as we may reasonably request, including information for research and development of services, products and programs, identification or demographic information, industry reports, and preparation of franchise disclosure documents.

### 11.      INSPECTIONS AND AUDITS.

### A.      ACCESS TO RECORDS.

To determine whether you are complying with this Agreement, we will have the right at any time during business hours, and upon notice as provided below, to inspect, audit and copy, or cause to be inspected, audited and copied, at your Office or such other place where your records may be located, the business and accounting records of the Office, including but not limited to closed property transaction files, journals, orders, receipts, and other data relating to the operation of your Office, including the books and records of: (i) any business whose funds may be commingled with the funds of the Office; (ii) any other business owned or operated by you or your Owners that operates at the same location as the Office; or (iii) any other business using the RE/MAX Marks. As part of any such inspection and audit, we also have the right to interview Office personnel and staff, inspect your computer system (including any hardware, software, or storage media) and conduct such other tests, reviews and inspections deemed desirable by us. You will cooperate, and you must ensure that everyone affiliated with your Office cooperates, with us or our representatives (including but not limited to independent accountants) that may be hired by us to conduct such inspection, interviews or audit, and you will permit us or our representatives to take photographs, videos, or other electronic recordings of the Office.

We will provide you with not less than 48 hours advance notice of any inspection and audit, except if a circumstance arises where we believe that criminal, unethical or other activity that adversely affects—or is likely to adversely affect—the reputation or image of the RE/MAX name or the goodwill associated with the RE/MAX Marks is occurring in your Office. In such event, we shall have the right at any time during business hours, without notice to you, to conduct an inspection and/or audit of the business and accounting records of your Office.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

B.   **AUTHORIZATION FOR RELEASE OF RECORDS; AUTHORIZATION TO CONDUCT CREDIT REPORT AND BACKGROUND CHECK.**

You authorize any federal, local or state body regulating or supervising real estate brokerage practices to release to us all records and information it maintains for your Office including the names of Sales Associates licensed with your Office, complaints filed against you or anyone affiliated with your Office or information pertaining to any disciplinary actions taken against you or anyone affiliated with your Office. You also authorize us to conduct a credit report, criminal background check, and/or asset investigation, on you, your Owners, or anyone affiliated with your Office, at any time (including up to 1 year after the termination or expiration of this Agreement), and for any reason, including but not limited to making decisions relating to the enforcement of the Agreement. You agree to fully cooperate with us in accessing information maintained by the regulatory authorities and conducting a credit report or criminal background check and, to that end, you agree to provide us with such information, execute such documents or take such other action as we deem necessary.

C.   **UNDERSTATEMENT OF AMOUNTS OWED/COST OF INSPECTION OR AUDIT.**

In the event any such inspection or audit reveals an understatement of any fees, payments or amounts owed to us, you must pay, within 10 days after receipt of the inspection or audit report, all such fees, payments or amounts plus interest at the rate provided in Subsection 6.F. hereof from the date originally due until the date of payment. Further, in the event an inspection or audit is made necessary by your failure to furnish reports, supporting records, or other information, as required by this Agreement, or to furnish reports, records, and information on a timely basis, or if an understatement of any amounts owed to us for any 3 month period is determined by the audit or inspection to be greater than 5%, or if the inspection reveals other conduct that is in any way unlawful or in breach of this Agreement, you must reimburse us for the cost of the audit or inspection, including, without limitation, the charges of any of our representatives (including but not limited to independent accountants) and the travel expenses, room and board, and compensation of our employees. The foregoing remedies are in addition to all other remedies and rights we may have under this Agreement or under applicable law.

12.   **TRANSFER AND ASSIGNMENT PROVISIONS.**

A.   **TRANSFER BY RE/MAX, LLC.**

This Agreement is fully transferable by us and will inure to the benefit of any person or entity to whom it is transferred, or to any other legal successor to our interest in this Agreement. You consent to any such assignment or transfer. Following the effective date of transfer or assignment, you shall look solely to the transferee or assignee, and not to us, for the performance of all obligations contained in this Agreement. We will not be required to obtain your consent or provide you with any notice in connection with any such transfer or assignment. You agree to execute any documents and take such other action required or deemed necessary by us or our transferee or assignee to effect such transfer or assignment.

B.   **NO TRANSFER OR ASSIGNMENT BY YOU OR YOUR OWNERS WITHOUT APPROVAL.**

You understand and acknowledge that the rights and duties created by this Agreement are personal to you, or if you are a Business Entity, your Owners, and that we have entered into this Agreement in reliance upon the individual or collective character, skill, aptitude, business ability, and financial capacity of you or, if appropriate, your Owners. Accordingly, neither this Agreement, the Franchise, all or a substantial portion of the assets of the Franchise or Office, nor any interest (as defined below) belonging to you or your Owners may be voluntarily, involuntarily, directly or indirectly, sold, leased, conveyed, given away, subfranchised, sublicensed, pledged, mortgaged, assigned, transferred, encumbered or otherwise disposed of by you or your Owners (including, without limitation, by will, inheritance, declaration of or transfer in trust or by operation of law) without our prior written approval. Any such assignment, transfer or encumbrance without such approval shall have no effect and shall constitute a breach of this Agreement. A transfer of ownership of the Franchise or Office (or its assets) may only be made in conjunction with a transfer of this Agreement. For purposes of this Section and any other Section of this Agreement, an "*interest*" shall mean shares of your stock or securities convertible into shares of your stock (if you are a corporation); proprietorship, partnership, membership or other interest (if you are a proprietorship, partnership, limited liability company or other type of business entity); or any other equitable or legal right in or to any shares of

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

such stock or in any such proprietorship, partnership, membership or other interest. Any unauthorized sale, lease, conveyance, gift, subfranchise, sublicense, pledge, mortgage, assignment, transfer or encumbrance by operation of law or otherwise, or any attempt to do so, shall be deemed void and grounds for us to terminate this Agreement.

C.   **CONDITIONS FOR TRANSFER OR ASSIGNMENT OF LESS THAN CONTROLLING INTEREST.**

If you, or if you are a Business Entity, your Owners, propose to transfer or assign any interest or interests totaling, in the aggregate, less than a controlling interest, we will not unreasonably withhold our consent to such transfer or assignment to persons who meet our qualifications for owners of RE/MAX offices, although we reserve the right to impose reasonable conditions as a prerequisite for receiving our approval. Such conditions may include some or all of the conditions set forth in Subsection 12.D. below, as we deem appropriate under the circumstances, except that we will not charge a transfer fee for any permitted assignment or transfer under this Subsection 12.C. "*Controlling interest*" shall be defined to be any interest greater than 50% ownership interest in a proprietorship, partnership or limited liability company or other type of business entity or, if a corporation, any interest greater than 50% of the equity and voting power of all issued and outstanding capital stock.

D.   **CONDITIONS FOR TRANSFER OR ASSIGNMENT OF AGREEMENT OR CONTROLLING INTEREST IN FRANCHISE OWNER.**

If you or your Owners propose to transfer or assign this Agreement, the Franchise, the assets of the Franchise or Office or a controlling interest (as defined above), we will not unreasonably withhold our consent provided you or your Owners, as appropriate, submit to us in connection with the request for our consent such financial and other information we prescribe demonstrating that the transferee(s) or assignee(s) have sufficient business experience, aptitude, qualifications and financial resources in our judgment to operate the Office and that they otherwise meet our criteria for ownership of a RE/MAX franchise. Because we have historically placed great value on developing business relationships with, and have relied on the personal skills of, individual franchise owners, we have generally permitted transfers or assignments only to individuals or entities closely owned or held by such individuals. In addition, our franchise agreements prohibit, and we have traditionally refused to permit, franchisees from engaging in competitive businesses. Moreover, we have historically declined transfers or assignments to competitors or entities controlled by or directly or indirectly affiliated with competitors or organizations in which conflicts of interest may arise, or for which their RE/MAX real estate office will not be their principal focus. Accordingly, it shall not be deemed unreasonable for us, and we expressly reserve the unfettered right, (i) to withhold our consent to proposed transfers or assignments to institutions (whether held publicly or privately) including, by way of example only, banking or other financial institutions, mutual fund companies and insurance companies, mortgage companies and title companies; and (ii) to withhold our consent to transfers or assignments to individuals or entities offering products or services that directly or indirectly compete with the products or services offered by RE/MAX offices or us, or that are designed to bolster other business activities as opposed to focusing primarily on the RE/MAX real estate brokerage business, including without limitation, real estate, mortgage, title, insurance, relocation or franchising services.

In addition, we may require that any or all of the following conditions be met before or at the time of such assignment or transfer:

(1)   you and your Owners must be in compliance with the terms and conditions of this Agreement and any other franchise or other agreements you or your Owners may have with us;

(2)   you must pay any amounts owed to us which are unpaid, including the entire unpaid balance of any promissory note with us and any interest due on such note;

(3)   you must submit to us for our review and prior approval all proposed transfer or assignment documents, including any purchase and sale agreements to be executed in connection with such transfer or assignment;

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(4)      you must submit to us current, accurate financial statements and other documents of the proposed transferee(s) or assignee(s) sufficient to enable us to either approve or disapprove, in our sole discretion, the character, creditworthiness, business experience, professional credentials and ethical background of the proposed transferee(s) or assignee(s);

(5)      the transferee(s) or assignee(s) must meet our then current subjective and objective standards for new franchisees, including, if then applicable, those relating to relevant experience, education and licensing, background and past record of compliance with laws, financial capacity, skills, integrity and other qualities of character.   The transferee(s) or assignee(s) must also execute a form authorizing RE/MAX, LLC to obtain a consumer report and to conduct a credit and background check;

(6)      the transferee(s) or assignee(s), if appropriate as determined by us, must agree to attend and complete the RE/MAX training course then being offered by us;

(7)      if your lease or sublease for the Premises requires it, the landlord of the Premises  must have consented to the assignment of the lease or sublease of the Premises to the transferee(s) or assignee(s);

(8)      you must pay us a transfer fee equal to $2,500 plus any amounts deemed necessary by us to cover any additional costs, such as administrative and legal expenses, we may incur in connection with such transfer or assignment;

(9)      you and your Owners must execute a transfer or assignment agreement and a full general release (in a form satisfactory to us) of any and all claims against us and our officers, managers, directors, employees, affiliates and agents;

(10)      the transferee(s) or assignee(s) must execute a new franchise agreement with us in the form we are then customarily using in the grant of franchises for RE/MAX offices (including any transfer addendum then being used by us), which agreement and any transfer addendum shall supersede this Agreement and may have different terms than this Agreement, including, without limitation, higher fees, advertising contributions and Minimum Agent Counts.  The new Franchise Agreement shall provide, at RE/MAX, LLC's discretion, for either a term coinciding with the remainder of the Term or a term consistent with the terms of franchise agreements granted at the time of transfer;

(11)      the transferee(s) or assignee(s) must execute and deliver to us a transfer agreement, personal guaranty and such other documents as we may require or deem important or desirable to the preservation and protection of our rights; and

(12)      you must purchase an extended reporting period endorsement covering a period of 3 years from the date of transfer of this Agreement (as set forth in more detail in Subsection 8.D.).

You agree that it shall not be unreasonable for RE/MAX, LLC to refuse to consent to an assignment or transfer on the basis that one or more of the above conditions have not been met.   You also acknowledge and agree that each of the above conditions is for the benefit of RE/MAX, LLC and that RE/MAX, LLC may waive the fulfillment of any condition.

E.      **DEATH, INCOMPETENCY OR PERMANENT DISABILITY**.

Upon the death, incompetency, or permanent disability (as defined below) of you or any Owner, the executor, administrator, conservator or other personal representative (hereinafter "***Personal Representative***") of such person may sell or transfer his/her interest in this Agreement and the Franchise within a reasonable time, not to exceed 6 months from the date of death or determination of incompetency or permanent disability, to a person we have approved.  Such sale or transfer, including, without limitation, transfers by a will or by inheritance, will be subject to all the terms and conditions for assignments and transfers contained in this Agreement.  Alternatively, the Personal Representative may choose to close the Office and terminate the Agreement within that 6 month period provided all other Owners agree with that decision, and provided the Personal Representative and all other Owners give RE/MAX, LLC at least 60 days written notice of their election to terminate, any and all outstanding fees have

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

been paid in full, and they sign a termination and mutual release agreement. During that 6 month period, the Office must be under the primary supervision of a manager who has a valid state real estate broker license and otherwise meets our management qualifications. Failure to appoint such a manager or to dispose of such interest within that 6 month period of time will constitute grounds for immediate termination of this Agreement.

For purposes of this Agreement, *"incompetency"* or *"permanent disability"* shall mean the inability to perform the usual and customary tasks necessary to operate the Office in compliance with the terms and conditions of this Agreement through the remainder of the Term. If requested by RE/MAX, LLC, you or your Personal Representative shall provide RE/MAX, LLC with a written opinion from your medical doctor stating that you are incompetent or that you have a permanent disability rendering you unable to operate the Office for the remainder of the Term.

### F.     TRANSFER TO A BUSINESS ENTITY.

If you are in full compliance with this Agreement, we will not unreasonably withhold our approval of a proposed assignment or transfer of this Agreement to a Business Entity provided you, or if there is more than one of you, all of you together, maintain and own a controlling interest (as defined above) in the Business Entity and, if you have not already done so, you execute a Guaranty and Assumption of Obligations, in the form prescribed by us, in which you personally guarantee and agree to be bound by, and responsible for the performance of, all of the terms, conditions, covenants and obligations under this Agreement. In addition, we reserve the right to impose reasonable conditions as a prerequisite for receiving our approval to any proposed assignment or transfer to a Business Entity. Such conditions may include some or all of the conditions set forth in Subsection 12.D. above, as we deem appropriate under the circumstances, except that we will not charge a transfer fee for any permitted assignment or transfer under this Subsection 12.F. that occurs within 1 year of the Agreement Date. In the case of assignment or transfer of this Agreement to a Business Entity, the Business Entity shall conduct no business other than the business of the Office and must be managed by one of the principal owners of the Business Entity or a manager as defined in Subsection 8.F. All Business Entities must comply fully with Subsection 8.E. of this Agreement. The articles of incorporation, by-laws, articles of partnership, partnership agreement and other organizational documents of the Business Entity shall recite that the issuance and transfer of any interest therein is restricted by the terms of this Section 12 and all issued and outstanding stock certificates of any corporation shall bear a legend reflecting or referring to the restrictions of this Section 12. Transfers of shares or of partnership, membership or other interests will be subject to the provisions of this Section 12.

### G.     EFFECT OF APPROVAL OF TRANSFER OR ASSIGNMENT.

Our consent to a transfer or assignment of any interest subject to the restrictions of this Section 12 shall not constitute a waiver of any claims we may have against the transferor or assignor under this Agreement, nor shall it be deemed a waiver of our right to demand exact compliance with any of the terms or conditions of the new franchise agreement by the assignee(s) or transferee(s).

### 13.     TERMINATION OF THE FRANCHISE.

### A.     TERMINATION BY RE/MAX, LLC WITH CAUSE.

You will be deemed to be in material default of an essential condition of this Agreement in the event of the occurrence of any of the specific defaults listed in Subsections 13.B., 13.C., and 13.D. below. You acknowledge and agree that the occurrence of any such material default will constitute just and good cause for termination of your rights under this Agreement, or any other franchise agreement between you or your Owners and RE/MAX, LLC and any of its affiliates, and that our right to terminate this Agreement based on any such material default is reasonable.

### B.     IMMEDIATE TERMINATION.

You will be in material default of an essential condition of this Agreement and we have the right to terminate this Agreement effective upon delivery of notice of termination to you and without providing an opportunity to cure, if:

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(1)     you and RE/MAX, LLC, acting reasonably and in good faith, have not agreed on a location for the Office within 90 days of the Agreement Date;

(2)     you fail to open the Office and begin business operations in compliance with the terms and provisions of this Agreement within 180 days of the Agreement Date;

(3)     you or your Owner responsible for the Office fails to attend the first RE/MAX management training course conducted for new franchisees by RE/MAX, LLC after the Agreement Date;

(4)     you voluntarily abandon, surrender, transfer control of, or lose the right to occupy the Premises—or fail to actively operate the Office—for a period in excess of 5 consecutive business days unless your failure to do so is caused by fire, flood, earthquake or other similar cause beyond your reasonable control, as more fully set forth in Subsection 15.Z.;

(5)     you or any of your Owners sell, lease, convey, give away, subfranchise, sublicense, pledge, mortgage, assign, transfer, encumber or otherwise dispose of any direct or indirect interest in this Agreement, the Franchise, the assets of the Franchise or Office or any interest in violation of the provisions of Section 12 of this Agreement;

(6)     a voluntary or involuntary petition in bankruptcy is filed by or against you or any of your Owners unless such petition is set aside, withdrawn or ceases to be in effect within 20 days of the date of any such filing;

(7)     you or one of your Owners is declared or judicially determined to be insolvent or all or a substantial part of your or your Owner's assets are assigned to or for the benefit of any creditor, or you admit your inability to pay your debts as they become due, or a liquidator, trustee in bankruptcy, custodian, receiver, receiver and manager, sheriff, or any other officer with similar powers is appointed temporarily or permanently, either privately or by a court of competent authority for or over you or one of your Owners;

(8)     if you are a Business Entity, the Business Entity is seized, taken over or foreclosed by a governmental official in the exercise of its duties, or seized, taken over or foreclosed by a creditor, lien holder or lessor, a final judgment against you remains unsatisfied for 30 days or a levy of execution has been made upon the Business Entity or upon any property used in the Business Entity and it is not discharged within 5 days of such levy;

(9)     your or any of your Owners' real estate license is suspended or revoked by the governing real estate commission; or you or any of your Owners or your or your Owners' spouses or domestic partners, Sales Associates or other persons affiliated with or represented as being affiliated with your Office materially violate laws applicable to real estate brokerage and related activities or are convicted of or plead no contest to any crime or offense or engage in other conduct or activity that RE/MAX, LLC reasonably believes adversely affects or is likely to adversely affect the reputation or image of the Office, other RE/MAX offices or RE/MAX Affiliates, RE/MAX, LLC, or the goodwill associated with the RE/MAX Marks or the System; or you or any of your Owners engage in any other conduct or activity that is unprofessional, unethical, dishonest or disruptive to the effective operation of the Office;

(10)     you fail to comply with any federal, state or local law applicable to the operation of the Franchise within 10 days after notification of noncompliance from us or any applicable agency;

(11)     you or any of your Owners, or anyone affiliated with your Office, is determined to be in violation of an Anti-Terrorism Law (as defined in Subsection 8.O.) or the United States Foreign Corrupt Practices Act (as defined in Subsection 8.P.), or otherwise violates any provisions of Subsection 8.O. or Subsection 8.P.;

(12)     you or your Owners make any misrepresentation to us, or omit any material information—including but not limited to information bearing on your or your Owners' integrity or other qualities of character—in your application for the rights granted by this Agreement or in the financial information provided by you and your Owners;

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

(13)    there is a failure to appoint a manager or dispose of an ownership interest upon the death, incompetency or permanent disability of you or an Owner as provided in Subsection 12.E.;

(14)    you or any of your Owners fail on 3 or more separate occasions within any 12 consecutive month period to comply with this Agreement or any mandatory elements of the System we prescribe, whether or not such failures to comply are corrected after notice is given to you; or

(15)    you or any of your Owners fail to comply with any requirement, obligation, term or condition of any other franchise or other agreement between you or your Owners and us or any of our affiliates, and do not cure such default in accordance with the terms of such other agreement.

C.    **10 DAYS NOTICE.**

We have the right to terminate this Agreement effective 10 days after providing written notice to you if:

(1)    you or your Owners do not pay when due any monies owed to us;

(2)    you or your Owners default under the terms of any promissory note executed in favor of us; or

(3)    you or your Owners fail to report to us all Sales Associates affiliated with the Office or any Team Office for any month or fail to comply with any of the other records and reporting requirements set forth in Section 10 of this Agreement.

This notice will advise you, and you hereby understand and agree, that if the default is not cured within 10 days, this Agreement automatically terminates at the end of such 10 days without further notice from us.

D.    **30 DAYS NOTICE.**

We have the right to terminate this Agreement effective 30 days after providing written notice to you if:

(1)    you or your Owners fail to meet and maintain your Minimum Agent Count as provided in Section 7 of this Agreement;

(2)    you or your Owners fail to obtain the insurance coverage identified in Subsection 8.D. of this Agreement; or

(3)    you or your Owners fail to comply with any other provision of this Agreement or any standard, procedure, policy or guideline we prescribe.

This notice will advise you, and you hereby understand and agree, that if the default is not cured within 30 days, this Agreement automatically terminates at the end of such 30 days without further notice from us.

14.    **RIGHTS AND OBLIGATIONS OF RE/MAX, LLC AND FRANCHISE OWNER UPON TERMINATION OR EXPIRATION OF THE FRANCHISE.**

A.    **PAYMENT OF AMOUNTS OWED TO RE/MAX, LLC.**

You agree to pay us within 5 days after the effective date of termination or expiration of the Franchise, or at any later date that the amounts due to us are determined, such continuing franchise fees, advertising contributions, Lost Future Revenue, and all other amounts owed to us which are then unpaid.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

B.    **DE-IDENTIFICATION**.

You and your Owners agree that after the termination or expiration of the Franchise you and your Owners will, at your sole expense:

(1)    immediately and clearly distinguish your operations from RE/MAX and the System, so as to avoid any possibility of confusion to the public, and not directly or indirectly at any time identify any business with which you are associated as being a current or former RE/MAX office or franchisee or otherwise use the System or hold yourself out to the public in any way as being or as having been affiliated with us or other RE/MAX Affiliates;

(2)    immediately remove, erase or obliterate the RE/MAX Marks from your letterhead, stationery, printed matter, advertising, websites and web pages (including without limitation, in visual content, hyperlinks, source code, meta tags, and third-party directory listings), software applications, social media services and other materials as well as all words and designations indicating that you are or were associated or affiliated with us or other RE/MAX Affiliates;

(3)    immediately take any action that may be required to cancel all trade, fictitious or assumed names or equivalent registrations which contain any reference to any RE/MAX Mark;

(4)    immediately notify your state real estate commission, your local board of REALTORS®, the National Association of REALTORS®, and your clients that your Office is no longer in existence and, unless you have affiliated with another RE/MAX office, that you are no longer affiliated with the RE/MAX organization;

(5)    immediately assign and transfer all of the RE/MAX Formative Domain Names or other domain names that include the RE/MAX Marks (or any variation thereof) that you register, and all those that your Sales Associates have registered, to us or our designee or, if we so direct, to deactivate and delete from the domain name registrar's records some or all of such domain names or take such actions regarding such domain name(s) as we may direct;

(6)    immediately take any action that may be required to cancel, or at our request transfer to us or our designee, all pseudonyms, logins, and identifiers (including but not limited to vanity license plates, user names, instant messaging and social media screen names and user names, and email addresses) that contain any reference to any RE/MAX Marks;

(7)    refrain from adopting or using in any manner, or for any purpose, the RE/MAX Marks, including without limitation: i) the RE/MAX red-over-white-over-blue trade dress or any other trade dress that on review is deemed by us to be confusingly similar to the RE/MAX trade dress; or ii) the terms "RE/MAX," "REMAX" or "MAX" or any other term that begins with the prefix "RE" or ends in the suffix "MAX" or any other term that on review is deemed by us to create a possibility of confusion or question regarding your or your Owners' affiliation with or sponsorship or endorsement by the RE/MAX organization. You further agree to refrain from the use of any "for sale" sign, trade dress or identity scheme comprised of lateral elements in red and blue separated by a white element, from the use of a design comprised of a three horizontal bar design, and from the use of a hot air balloon or a hot air balloon symbol;

(8)    refrain from referring to designations, certifications, awards or recognition that we or any of our related or affiliated companies may have granted to you or your Owners at any time during your affiliation with the RE/MAX Network in any form of advertising or promotion;

(9)    if you retain possession of the Premises or, if you do not, prior to vacating the Premises, immediately and completely remove or modify any signage bearing the RE/MAX Marks and any part of the interior and exterior decor that we deem necessary to disassociate the Premises from the appearance of a RE/MAX office. If you do not take the actions we request within 10 days after notice from us, you agree that we have the right to enter the Premises, if you retain them, or to arrange entry with the owner of the Premises if you do not retain them, and make the required changes at your expense and without liability to

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

you or other third parties for trespass or any other claim, and you agree to reimburse us for those expenses on demand. You acknowledge and agree that by executing this Agreement, you grant RE/MAX, LLC a power of attorney that enables it or its designees to take, on your behalf, any and all actions required to effectuate the provisions of this Subsection 14.B.(9);

(10)    deliver to RE/MAX, LLC all Operations Materials, as well as any other RE/MAX specific materials relating to or concerning operation of a RE/MAX franchise, that you received from RE/MAX, LLC, as set forth in Subsection 8.B. of this Agreement;

(11)    refrain from directly or indirectly disputing the validity of the RE/MAX Marks or RE/MAX, LLC's ownership thereof, or challenging any application or registration owned by RE/MAX, LLC for a RE/MAX Mark; and

(12)    promptly assign, except in the case of a Pre-existing Telephone Number as described in Subsection (12) a., all of the telephone numbers listed for the Office to RE/MAX, LLC, or its designee, with no forwarding message or other information that would steer callers from RE/MAX, LLC or its designee, and immediately instruct the telephone company in writing to redirect all calls to such numbers to us or in accordance with our directions. You hereby direct each such telephone company or directory listing agency to accept your signature on this Agreement as your signed authorization and direction to them to assign numbers and redirect calls as described above, and to discontinue as soon as practicable any and all on-line or printed phone directory advertising or listings that refer to the Office, or, as directed by RE/MAX, LLC, to modify same to include other phone numbers. You acknowledge and agree that by executing this Agreement, you grant RE/MAX, LLC a power of attorney that enables it to take, on your behalf, any and all actions required to effectuate the provisions of this Subsection 14.B.(12);

a.    If (i) your Office operated as a RE/MAX real estate office less than 9 years prior to the termination or expiration of the Franchise, and (ii) you obtained and used your Office's telephone number in connection with a non-RE/MAX real estate office prior to the Agreement Date, then we will not require you to assign such number (the "Pre-existing Telephone Number") to us or our designee provided you direct any phone calls and inquiries that you receive that are intended for a RE/MAX Affiliate to the RE/MAX office closest to you. If you fail to abide by this requirement, you must immediately assign such Pre-existing Telephone Number in accordance with Subsection 14.B. (12).

C.    **CONFIDENTIAL INFORMATION.**

You agree that on termination or expiration of the Franchise you and your Owners will immediately cease to use, but maintain the confidentiality over, any of the Confidential Information, Operations Materials, procedures, techniques, all other manuals, forms, rosters or other materials, regardless of format (and all of any such items) acquired from us, and agree not to use, sell, convey, display or share, in whole or in part, any of such items for any purpose. You further agree to return, and shall ensure that your Owners return, all such items to us or destroy them in a secure manner.

D.    **CONTINUING OBLIGATIONS.**

All obligations of this Agreement (whether yours or ours) which expressly or by their nature are intended to survive the expiration or termination of this Agreement will continue in full force and effect after and notwithstanding its expiration or termination until such obligations are satisfied in full or by their nature expire.

E.    **MONETARY OBLIGATIONS NOT RELEASED.**

Termination or expiration of this Agreement shall not terminate any monetary obligation that you may owe to us or to any other person or entity as may be required by this Agreement, and shall not entitle you to any refund of any monies previously paid pursuant to the terms of this Agreement.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

F.       **TERMINATION NOT EXCLUSIVE REMEDY.**

Termination of this Agreement by us shall not be an exclusive remedy and shall not in any way affect our rights to receive or collect fees, dues or other amounts required to have been paid by you under this Agreement, to enforce the provisions of this Agreement against you or to sue for damages or to pursue any other legal or equitable remedy for a breach of this Agreement by you.

G.       **RIGHT TO MEET WITH SALES ASSOCIATES.**

In order to facilitate an orderly and efficient transition and to preserve the goodwill associated with the RE/MAX name and RE/MAX Marks in the event of termination or expiration of this Agreement, you agree that we shall have the right to contact and communicate personally with any or all of your Sales Associates to solicit and/or to discuss with them their options for continued affiliation with other RE/MAX offices and/or opportunities to purchase a RE/MAX franchise:

(i)       180 days prior to expiration of this Agreement if you elect not to renew (either by notifying us of your intent not to renew or by failing to timely provide us with notice of your intentions regarding renewal);

(ii)       90 days prior to expiration of this Agreement if you timely elect to renew, but fail to timely sign the new form of franchise agreement as required by Subsection 2.E. of this Agreement; or

(iii)       in the case of termination, immediately after notice of default has been delivered to you (including during any period of time you may have to cure defaults).

H.       **DAMAGES.**

Notwithstanding anything contained herein, in addition to any other remedies provided for herein or under applicable law, you agree that after passage of a 10 day period following the termination or expiration of this Agreement, the sum of $500 shall be paid to us for each day you fail to perform your obligations under any of the following Subsections 14.B.(1), (2), (3), (4), (5), (6), (12), and 14.C., which monetary amount shall be regarded as liquidated damages and not as a penalty. This section does not limit or affect in any way you or your Owners' liability for trademark infringement, unfair competition or breach of contract, nor affect or limit the right of RE/MAX, LLC to seek or obtain injunctive relief, specific performance or other extraordinary relief.

I.       **FUTURE BUSINESS AND RESIDENCE ADDRESSES.**

For 3 years following the termination or expiration of this Agreement, you agree to keep us advised of the current business and residential address(es) and telephone numbers of you and your Owners, as well as the business address and telephone number of all such person's employers, if any.

J.       **POST TERMINATION NON COMPETITION AGREEMENT.**

You agree that if this Agreement is terminated, regardless of the cause, prior to expiration of the Term, neither you nor your Owners, officers or guarantors, nor any of their spouses or domestic partners will—for a period of 1 year from the effective date of termination—become an officer, director, shareholder, member, licensee, partner or manager of, or otherwise directly or indirectly operate, manage, own or have any ownership interest in any business that is a licensee or franchisee of any franchising organization or network that competes with RE/MAX, LLC. Nothing in this Subsection shall be deemed to restrict affiliation as a real estate agent with a franchisee of any franchising organization or network.

K.       **ERRORS AND OMISSIONS INSURANCE**

You agree that after the termination or expiration of the Franchise you will purchase an extended reporting period endorsement covering a period of 3 years from the date of termination of this Agreement (as set forth in more detail in Subsection 8.D.).

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

15. **CONSTRUCTION OF AGREEMENT AND ENFORCEMENT**.

    A.    **INVALID PROVISIONS; SUBSTITUTION OF VALID PROVISIONS**.

    If any law or court order requires a greater advance notice of the termination or non-renewal of this Agreement than is required under this Agreement, or the taking of some other action which is not required by this Agreement, the notice and/or other action required by law or such order shall apply. If any portion or provision of this Agreement or any specification, standard, operating procedure, policy or guideline we prescribe is inconsistent with, or rendered invalid or unenforceable by, any law or court order, the inconsistent, invalid or unenforceable portion or provision shall be modified so as to be valid and enforceable. If such portion or provision of this Agreement cannot be saved, it shall be stricken and its deletion shall not affect the validity or enforceability of the other portions or provisions of this Agreement or such specification, standard, operating procedure, policy or guideline.

    B.    **UNILATERAL WAIVER OF OBLIGATIONS**.

    Either of us may, by written notice, unilaterally waive or reduce any obligation or restriction of the other party under this Agreement. The waiver or reduction may be revoked at any time for any reason on 10 days' written notice.

    C.    **CONSENTS**.

    Whenever this Agreement requires our advance approval or consent, you agree to make a timely written request for it. Our approval or consent will not be valid unless it is in writing. Except where this Agreement expressly obligates us to reasonably approve or not unreasonably withhold our approval of any of your actions or requests, we have the absolute right to refuse any request by you or to withhold our approval of any action or omission by you.

    Whenever we have reserved in this Agreement a right to take or withhold an action, or to grant or decline to grant you a right to take or omit an action, except as otherwise expressly and specifically provided in this Agreement, we may make decisions or exercise rights on the basis of the information readily available to us, and our judgment of what is in our best interests and/or in the best interests of the RE/MAX Network, at the time our decision is made, shall be deemed to be reasonable and enforceable, without regard to whether other reasonable or even arguably preferable alternative decisions could have been made by us and without regard to whether our decision or the action we take promotes our financial or other individual interest.

    D.    **NO GUARANTEES**.

    If in connection with this Agreement we provide to you any waiver, approval, consent, or suggestion, or if we neglect or delay our response or deny any request for any of those, we will not be deemed to have made any warranties or guarantees which you may rely on, and will not assume any liability or obligation to you.

    E.    **NO WAIVER**.

    If at any time we do not exercise a right or power available to us under this Agreement or do not insist on your strict compliance with the terms of the Agreement, or if there develops a custom or practice which is at variance with the terms of this Agreement, we will not be deemed to have waived our right to demand exact compliance with any of the terms of this Agreement at a later time. Similarly, our waiver of any particular breach or series of breaches under this Agreement or under any other agreement between us and any franchisee will not affect our rights with respect to any later breach. It will also not be deemed to be a waiver of any breach of this Agreement for us to accept payments which are due to us under this Agreement.

    F.    **CUMULATIVE REMEDIES**.

    The rights and remedies specifically granted to either you or us by this Agreement will not be deemed to prohibit either of us from exercising any other right or remedy provided under this Agreement or permitted by law or equity.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

G.      **SPECIFIC PERFORMANCE; INJUNCTIVE RELIEF**.

You agree that we may, without being required to post a bond or other security, and even if this Agreement has been terminated or has expired, obtain temporary and permanent injunctions and orders of specific performance (1) to enforce the provisions of this Agreement relating to your use of the RE/MAX Marks and your non-disclosure and non-competition obligations under this Agreement, (2) to prohibit any act or omission by you or your agents or employees that constitutes a violation of any applicable law, ordinance or regulation, constitutes a danger to the public, or may impair the goodwill associated with the RE/MAX Marks, the System, us or other RE/MAX Affiliates, or (3) to prevent any other irreparable harm to our interests.

H.      **COSTS AND LEGAL FEES**.

If we engage legal counsel in connection with any failure by you or your Owners to comply with this Agreement, you shall reimburse us, upon demand, for the costs and expenses incurred by us as a result of such failure, including, without limitation, reasonable accountants', attorneys', attorneys' assistants', expert fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for, in contemplation of or in connection with the filing of any judicial proceeding to enforce this Agreement. This provision does not limit in any way our right to seek any other costs and expenses which may be governed by applicable court rules and claimable in the context of a legal proceeding. You and your Owners shall be responsible for your own such costs and expenses. This provision shall survive termination of this Agreement.

I.      **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL**.

THE PARTIES HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY AGGRAVATED, PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM EACH WILL BE LIMITED TO THE RECOVERY OF ANY ACTUAL COMPENSATORY DAMAGES. THE PARTIES IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER OF THEM.

J.      **WAIVER OF CLASS ACTION**.

TO THE EXTENT PERMITTED BY LAW, YOU AGREE THAT ANY JUDICIAL PROCEEDING WILL BE CONSIDERED AS TO ITS FACTS AND WILL NOT BE COMMENCED OR PROCEEDED WITH AS A CLASS ACTION. TO THE EXTENT PERMITTED BY LAW, YOU AND EACH OF YOUR OWNERS WAIVE ANY RIGHT TO PROCEED AGAINST RE/MAX, LLC BY WAY OF CLASS ACTION.

K.      **GOVERNING LAW/CONSENT TO JURISDICTION**.

EXCEPT TO THE EXTENT GOVERNED BY THE UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. §§1051 ET SEQ.), THIS AGREEMENT AND THE FRANCHISE WILL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF COLORADO (WITHOUT REFERENCE TO ITS CHOICE OF LAW AND CONFLICT OF LAW RULES). YOU AGREE THAT ANY ACTION ARISING OUT OF OR RELATING IN ANY MANNER TO THIS AGREEMENT SHALL BE INSTITUTED IN, AND ONLY IN, A STATE OR FEDERAL COURT OF GENERAL JURISDICTION IN THE COUNTY OF DENVER, STATE OF COLORADO AND YOU IRREVOCABLY SUBMIT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTION YOU MAY HAVE TO EITHER THE EXCLUSIVE JURISDICTION OR VENUE OF SUCH COURT; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION RELATING TO THE RE/MAX MARKS, OR ANY ACTION FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF, WE MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT THAT HAS JURISDICTION.

L.      **BINDING EFFECT**.

This Agreement is binding on and will inure to the benefit of our successors and assigns and will be binding on and inure to the benefit of your successors and assigns, and if you are an individual, on and to your heirs, executors and administrators.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

M.     **MODIFICATION OF FRANCHISE AGREEMENT.**

This Agreement may not be modified, amended or altered except by an instrument signed by all of the parties to this Agreement. Notwithstanding the preceding sentence, you understand and agree that we may, from time to time, to preserve and enhance the reputation of the RE/MAX organization, issue new (or amend or modify existing) standards, operating procedures, policies and guidelines pertaining to the System, provided that the mandatory elements of the System pertain to the goodwill or protection of the RE/MAX Marks. In addition, you agree that you will execute any amendments or modifications to this Agreement as may from time to time be required as a result of changes in governing law.

N.     **NO LIABILITY TO OTHERS; NO OTHER BENEFICIARIES.**

We will not, because of this Agreement or by virtue of any approvals, advice or services provided to you, be liable to any person or legal entity who is not a party to this Agreement. You understand that you are not a third party beneficiary of any other franchise agreement between us and other RE/MAX franchisees and that you have no independent right to enforce the terms of, or require performance under, any other franchise agreement.

O.     **PARAGRAPH HEADINGS/CONSTRUCTION.**

All headings of the various Sections and Subsections of this Agreement are for convenience only and do not affect the meaning or construction of any provision. All references in this Agreement to masculine, neuter or singular usage will be construed to include the masculine, feminine, neuter or plural, wherever applicable.

P.     **JOINT AND SEVERAL LIABILITY.**

If the Franchise Owner consists of more than one person or Business Entity, or a combination thereof (i) the obligation and liabilities to RE/MAX, LLC of each such person or Business Entity are joint and several; (ii) a right under the Agreement exercised by any one of them is deemed to be exercised jointly; (iii) a representation, warranty, or undertaking made by one person or Business Entity is deemed to be a representation made by each of them.

Q.     **MULTIPLE ORIGINALS.**

This Agreement may be executed using multiple copies, each of which will be deemed an original.

R.     **TIMING IS IMPORTANT.**

Time is of the essence of this Agreement. (*"Time is of the essence"* is a legal term that emphasizes the strictness of time limits. In this case, it means it will be a material breach of this Agreement to fail to perform any obligation within the time required or permitted by this Agreement.)

S.     **INDEPENDENT PROVISIONS.**

The provisions of this Agreement are deemed to be severable. In other words, the parties agree that each provision of this Agreement will be construed as independent of any other provision of this Agreement.

T.     **FRANCHISEE MAY NOT WITHHOLD PAYMENT.**

You agree to pay all amounts due under this Agreement without deduction, set-off or abatement. You further agree that you will not, on alleged grounds of non-performance by us of any of our obligations under this Agreement, withhold payment of any fees or other amounts due to us or any of our affiliates.

U.     **RELEASE OF PRIOR CLAIMS.**

By executing this Agreement, you individually and on behalf of your heirs, legal representatives, successors and assigns, and each assignee of this Agreement by accepting such assignment, release and discharge RE/MAX, LLC and its affiliated corporations, partnerships or other entities, and each of its present and former officers, managers, directors, employees, agents, servants, and subsidiaries, from any and all claims existing as of

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

the date of this Agreement, and which relate to or arise out of any franchise agreement or any other agreement between the parties executed prior to the date of this Agreement, or the franchise relationship previously existing between the parties, including but not limited to, any and all claims, whether presently known or unknown, suspected or unsuspected, arising under the franchise, securities, antitrust laws or other laws of the United States or of any state.

V.     **ACTIONS BARRED.**

Except for certain claims and actions as set forth below, any and all claims and actions arising out of or relating to this Agreement (including, but not limited to, the offer and sale of the franchise covered by this Agreement), the relationship between us and you or your operation of the Franchise, brought by any party to this Agreement against the other shall be commenced within 1 year from the occurrence of the acts or omissions giving rise to such claim or action, or such claim or action shall be barred. The foregoing 1 year limitation period will not apply to claims or actions by us for monies due under this Agreement, claims or actions relating to the RE/MAX Marks, or the trade names, copyrights, trade secrets or Confidential Information belonging to us or claims or actions relating to the post-termination obligations set forth in Section 14 of this Agreement.

W.     **AUTHORIZATION TO COMMUNICATE ELECTRONICALLY/PROMPT RESPONSE REQUIRED.**

By executing this Agreement, you authorize RE/MAX, LLC, as well as any of its affiliates and approved suppliers, to communicate with you electronically, including via electronic mail and facsimile and, unless a written communication is required, to communicate with you via telephone, notwithstanding whether any or all of your Office telephone numbers appear on a federal or state Do-Not-Call registry. You understand and acknowledge that it is critical to the efficient and successful administration of the franchise relationship that you promptly respond to all communications from us. Accordingly, you agree to respond within 5 business days to each communication from us.

X.     **NOTICES AND PAYMENTS.**

All written notices and reports permitted or required to be delivered by the provisions of this Agreement shall be deemed delivered at the time delivered by hand to the recipient party; 1 business day after transmission by electronic mail; 1 business day after being placed in the hands of a commercial courier service for overnight delivery, or 3 business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing. All payments and reports required by this Agreement shall be sent to us at the address to which you are notified from time to time, or to such other persons and places as we may direct from time to time.

Y.     **CANCELLATION OF PRIOR UNDERSTANDINGS/ENTIRE AGREEMENT.**

This Agreement expresses fully the understanding by and between the parties, and all prior and contemporaneous understandings, agreements, commitments, conditions, warranties and representations of any kind, oral or written, as to the Franchise (except as to information and representations submitted by you to us in application to purchase the Franchise, including, but not limited to, financial statements, references, etc. which shall be deemed to be a part of this Agreement) are canceled and null, void and of no effect. Any previous matter, presently covered within this Agreement, is hereby superseded and canceled with no further liabilities or obligations of the parties with respect to such matter, except as to any monies due and unpaid between the parties to this Agreement at the time of execution of this Agreement. Notwithstanding the foregoing, nothing in this Agreement is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you.

Z.     **FORCE MAJEURE.**

Neither party shall be deemed to be in breach of this Agreement if a party's failure to perform its obligations results from acts of god, fires, strikes, war, terrorism, riot, governmental laws or regulations, or any other similar event or cause. Any delay resulting from any of these causes will extend performance accordingly or excuse performance in whole or in part as may be reasonable, except that none of these causes shall excuse payments of amounts owed at the time of such occurrence.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

16.     **ACKNOWLEDGMENTS**.

You expressly acknowledge and accept the following:

(1)     YOU RECEIVED FROM US A RE/MAX FRANCHISE DISCLOSURE DOCUMENT AS REQUIRED BY LAW AT LEAST 14 CALENDAR DAYS PRIOR TO (i) THE EXECUTION OF THIS AGREEMENT; OR (ii) THE PAYMENT OF ANY CONSIDERATION TO US;

(2)     YOUR SUCCESS IN OWNING AND OPERATING A RE/MAX REAL ESTATE SERVICES BUSINESS IS SPECULATIVE AND WILL DEPEND ON MANY FACTORS INCLUDING, TO A LARGE EXTENT, YOUR INDEPENDENT BUSINESS ABILITY AND PERSONAL EFFORTS.  YOU FURTHER AGREE THAT YOU, ONE OF YOUR PRINCIPAL OWNERS, OR SUCH VALIDLY LICENSED REAL ESTATE BROKER AS YOU SELECT TO MANAGE THE OFFICE, WILL BE RESPONSIBLE FOR, AND INTENDS TO DEVOTE BEST EFFORTS AND FULL TIME TO, THE MANAGEMENT AND DEVELOPMENT OF THE OFFICE;

(3)     WE HAVE NOT GUARANTEED ANY RESULTS TO YOU AND CANNOT, EXCEPT UNDER AND TO THE EXTENT OF THE TERMS OF THIS AGREEMENT, EXERCISE CONTROL OVER YOUR BUSINESS;

(4)     YOU DID NOT RECEIVE ORAL OR WRITTEN INFORMATION CONTRARY TO THE INFORMATION CONTAINED IN OUR FRANCHISE DISCLOSURE DOCUMENT AND THIS AGREEMENT;

(5)     YOU DID NOT RECEIVE ORAL OR WRITTEN EARNINGS CLAIMS INFORMATION AND HAVE NOT RELIED ON ANY WARRANTY OR REPRESENTATION, EXPRESSED OR IMPLIED, AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT;

(6)     WE HAVE ENCOURAGED YOU TO SEEK LEGAL AND/OR OTHER PROFESSIONAL GUIDANCE AND ADVICE PRIOR TO SIGNING THIS AGREEMENT AND HAVE ENCOURAGED YOU TO CONTACT EXISTING RE/MAX FRANCHISEES TO GAIN A BETTER UNDERSTANDING OF THE REQUIREMENTS AND BENEFITS OF OWNING A RE/MAX OFFICE FRANCHISE;

(7)     YOU HAVE HAD A FULL OPPORTUNITY TO REVIEW THE DISCLOSURE DOCUMENT AND THIS AGREEMENT PROVIDED BY US AND UNDERSTAND THE TERMS, CONDITIONS AND OBLIGATIONS OF THIS AGREEMENT;

(8)     NO REPRESENTATIONS OR PROMISES HAVE BEEN MADE BY US TO INDUCE YOU TO ENTER INTO THIS AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED IN THIS AGREEMENT; AND

(9)     YOU HAVE NOT RELIED ON ANY STATEMENTS ABOUT US OR THE FRANCHISE OTHER THAN THOSE CONTAINED IN THE DISCLOSURE DOCUMENT IN MAKING YOUR DECISION TO SIGN THIS AGREEMENT.

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

44

DocuSign Envelope ID: AF4F62A0-39F7-4A94-84DF-FAC7935CA657

17.    **SUBMISSION OF AGREEMENT**.

      THE SUBMISSION OF THIS AGREEMENT TO YOU DOES NOT CONSTITUTE AN OFFER AND THIS AGREEMENT SHALL NOT BE BINDING ON US UNLESS AND UNTIL IT IS ACCEPTED BY US, THAT IS, SIGNED BY OUR AUTHORIZED OFFICER AND RETURNED TO YOU.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year set forth below.

---

**RE/MAX, LLC**
**d/b/a RE/MAX of Texas**

By: _Dana Tuggle_                    12/22/2018
     Dana Tuggle                    Date

Title: Region Vice President

---

**Franchisee**
**JL United Realty, LLC**

By: _Cheng Ching Lin_                    12/22/2018
    Joshua Lin                    Date

Title: President

---